OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of Ohio
are being transmitted electronically beginning May 27, 1992,
pursuant to a pilot project implemented by Chief Justice Thomas
J. Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.  Your
comments on this pilot project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised to
check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.  The
advance sheets to Ohio St.3d will also contain the volume and
page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.

In re Miamisburg Train Derailment Litigation.
[Cite as In re Miamisburg Train Derailment Litigation
(1994),      Ohio St.3d     .]
Railroads -- Railroad car transporting hazardous material
     involved in derailment ruptures and creates dangerous
     phosphorous cloud -- Federal Railroad Safety Act does not
     preempt common-law tort claims,
     (No. 92-1244 -- Submitted June 3, 1993 -- Decided February
9, 1994.)
     Appeal from the Court of Appeals for Montgomery County, No.
12590.
     On July 8, 1986, a train operated by CSX Transportation,
Inc. ("CSX") derailed in Miamisburg, Ohio.  One railroad car
involved in the derailment was UTLX 79499, a tank car
manufactured and owned by Union Tank Car Company ("UTC"), and
leased to Albright & Wilson, Inc.  UTLX 79499 was being used to
transport yellow phosphorous, a hazardous material, by a
corporation affiliated with Albright & Wilson, ERCO Company.
(Albright & Wilson and ERCO are hereinafter referred to as "A&W".)
     UTLX 79499 was ruptured in the derailment, and phosphorous
escaped and ignited upon exposure to the air, creating a
dangerous phosphorous cloud.  One of the ruptures was a six-inch
hole in the bottom of the tank shell at the brake support
attachment, where the brake attachment had separated from the
tank shell.  Local public safety officials ordered mass
evacuations of the surrounding area due to the potentially toxic
effects of the phosphorous cloud.
     Appellants, various individuals who were allegedly injured
as a result of the derailment, instituted this class action
against CSX, UTC, and A&W.  In addition to certifying the case as
a class action, the trial court certified the issues of
negligence, qualified nuisance, and punitive damages for trial.
Appellants reached a settlement with CSX during trial, and
proceeded against UTC and A&W, appellees, claiming that
phosphorous escaped because UTLX 79499 was not equipped with a
reinforcing pad where the brake attachment connected to the shell
of the tank car.  Such a pad would have allegedly reduced the
possibility of a rupture to the car during a derailment.

In 1971, federal regulations pertaining to the transportation of hazardous materials were amended. The regulations required all new railroad tank cars engaged in the transportation of hazardous materials to be equipped with reinforcing pads where any attachments (including brakes) met the shell of the tank car. Section 179.200-19(b), Title 49, C.F.R. A separate regulation allowed tank cars manufactured prior to the 1971 adoption of this regulatory mandate to continue in use. Section 179.1(c), Title 49, C.F.R. UTLX 79499, manufactured in 1966, was thus allowed to remain in use without complying with the reinforcing pad regulatory requirement.

Prior to trial, UTC and A&W moved for summary judgment, arguing that appellants' common-law tort claims were preempted by the federal regulations governing tank car specifications. The trial court in effect overruled both motions, finding that alleged compliance with federal regulations did not preempt appellants' claims. At the close of appellants' evidence, however, the court granted UTC's and A&W's motions for directed verdicts. As to UTC, the trial court found it significant that appellants' experts acknowledged that UTC had met all the applicable United States Department of Transportation ("DOT") regulations in effect for the transportation of hazardous materials, and held that UTC had no regulatory duty to retrofit UTLX 79499 with reinforcing pads. A&W was held to be not negligent because appellants had been unable to show that A&W should reasonably have known that the tank car was unsafe for its intended use.

On appeal, the court of appeals affirmed. However, the court based its decision on its finding that the Federal Railroad Safety Act ("the FRSA") preempted appellants' common-law tort claims against UTC and A&W. Thus, the court of appeals effectively found that the trial court should have granted summary judgment to appellees on preemption grounds.

The cause is now before this court pursuant to the allowance of a motion to certify the record.

Waite, Schneider, Bayless & Chesley Co., L.P.A., Stanley M. Chesley and Terrence L. Goodman; Ruppert, Bronson & Chicarelli Co., L.P.A., and James D. Ruppert, for appellants.
Freund, Freeze & Arnold, Gordon D. Arnold and Patrick J. Janis; Johnson & Bell, Ltd., William V. Johnson, Thomas H. Fegan and William A. Geiser, for appellee Union Tank Car.
Rendigs, Fry, Kiely & Dennis, W. Roger Fry, Ralph F. Mitchell and Jonathan P. Saxton, for appellees Albright & Wilson and ERCO.

Per Curiam. This case requires us to determine whether appellants' common-law tort claims are preempted by federal law. For the reasons which follow, we answer this question in the negative.

I

A

The United States Congress enacted the FRSA in 1970 "to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to

persons and to reduce damage to property caused by accidents involving any carrier of hazardous materials."  Section 421, Title 45, U.S.Code.  The FRSA gives the United States Secretary of Transportation ("the Secretary") powers to "prescribe, as necessary, appropriate rules, regulations, orders, and standards for all areas of railroad safety ***."  Section 431, Title 45, U.S.Code.  Section 434, Title 45, U.S. Code is the preemption provision of the FRSA, and provides that "*** laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable.  A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary [of Transportation] has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement.  ***"  (Emphasis added.)  Thus, under the FRSA, a state requirement may remain in effect until the Secretary has adopted a regulation "covering the subject matter" of the state requirement.1

In 1971, the Secretary of Transportation adopted Section 179.200-19(b), Title 49, C.F.R., detailing when "[r]einforcing pads must be used between external brackets and shells ***" for tank cars hauling hazardous materials.  The parties essentially agree that this provision would have applied to require reinforcing pads where the brake attachment met the tank shell of UTLX 79499 had the Secretary not adopted another regulation allowing tank cars manufactured prior to 1971, such as UTLX 79499, to continue in use without compliance.  Thus, the reinforcing pad requirement applies only to tank cars manufactured after 1971 (the time the regulation was adopted), because of the language in Section 179.1(b), Title 49, C.F.R. that "[e]xcept as provided in paragraph (c) of this section, tanks to which this part is applicable, must be built to the specifications prescribed in this part"; and the further language of Section 179.1(c), Title 49, C.F.R. that "[t]anks built to specifications predating those in this part may continue in use as provided in [Section] 173.31 of this subchapter."

Appellees essentially claim that, through these regulations, the Secretary of Transportation has "cover[ed] the subject matter" (in reference to Section 434, Title 45, U.S.Code) regarding reinforcing pads for external attachments, such as the brakes at issue in this case.  For that reason, appellees argue that appellants' state common-law tort claims alleging that appellees were negligent in operating UTLX 79499 without the reinforcing pads are preempted.

B

Before we proceed to consider whether appellants' claims are preempted by Section 434 of the FRSA, we must consider whether another preemption standard should more appropriately be applied to this case.  Specifically, we consider whether the preemption provision of the Hazardous Materials Transportation Act ("the HMTA") is applicable to appellants' common-law tort claims.  Because the regulations promulgated by the Secretary which we consider in this case by their terms govern only tank cars hauling hazardous materials, an argument could be made that the HMTA preemption provision is the applicable one.

In 1975, the United States Congress enacted the HMTA in order to "protect the nation adequately against the risks to life and property which are inherent in the transportation of hazardous materials in commerce." Section 1801, Title 49, U.S.Code. The HMTA authorizes the Secretary of Transportation to issue "regulations for the safe transportation in commerce of hazardous materials. Such regulations shall be applicable to any person who transports *** a hazardous material ***." Former Section 1804(a), Title 49, U.S.Code.

The HMTA preemption provision (Section 1811[a], Title 49, U.S.Code) states that "[e]xcept as provided in subsection (b) of this section, any requirement, of a State or political subdivision thereof, which is inconsistent with any requirement set forth in this chapter, or in a regulation issued under this chapter, is preempted." (Emphasis added.) Unlike the preemption provision of the FRSA, which allows a state to adopt or continue in force a regulation or standard until the Secretary has issued regulations "covering the subject matter," the HMTA permits such state regulation so long as the state regulation is not "inconsistent" with the federal requirement.

In CSX Transp., Inc. v. Pub. Util. Comm. (C.A.6, 1990), 901 F.2d 497, certiorari denied (1991), 498 U.S. 1066, 111 S.Ct. 781, 112 L.Ed.2d 845, the Sixth Circuit Court of Appeals considered whether the FRSA preemption provision or the HMTA preemption provision should be applied to determine if an Ohio statute and Ohio regulations regarding the transportation of hazardous materials by rail were preempted. The court posed the question before it as, "[s]hould a train carrying a load of hazardous waste be considered a railroad which happens to be carrying hazardous waste (thus suggesting application of the FRSA preemption provision) or hazardous waste which happens to be carried by rail (thus suggesting application of the HMTA preemption provision)?" Id., 901 F.2d at 501.

After considering statutory histories of the HMTA and the FRSA, the court concluded that "*** the purpose of the HMTA was to consolidate regulation of hazardous material transportation at the Secretarial level, and not to remove such regulation of hazardous material transportation by rail from the preemption provision of the FRSA." Id. The court based this conclusion in part on the legislative history of the HMTA, as well as the plain language of Section 434 of the FRSA: "We find that the language of the FRSA, 'any law *** relating to railroad safety,' *** applies to the HMTA as it relates to the transportation of hazardous material by rail." Id.

Like the Sixth Circuit in CSX Transp., Inc. v. Pub. Util. Comm., we conclude that Section 434 of the FRSA is the applicable preemption provision in analyzing whether the Secretary's regulations at issue in this case preempt appellants' claims. See CSX Transp. Corp. v. Easterwood (1993), 507 U.S. ___, ___, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387, 396, fn. 4 ("[T]he plain terms of Section 434 do not limit the application of its express pre-emption clause to regulations adopted by the Secretary pursuant to FRSA. Instead, they state that any regulation 'adopted' by the Secretary may have pre-emptive effect, regardless of the enabling legislation.")

II

A

The Supremacy Clause (Clause 2, Article VI) of the United States Constitution provides that the laws of the United States "shall be the supreme law of the land ***."  Pursuant to this provision, the United States Congress possesses the power to preempt state law.  In Cipollone v. Liggett Group, Inc. (1992), 505 U.S.    ,    , 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407, 422-423, the United States Supreme Court observed:  "Congress' intent [to preempt] may be 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.' Jones v. Rath Packing Co., 430 U.S. 519, 525 [97 S.Ct. 1305, 1309, 51 L.Ed.2d 604, 614] (1977).  In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law, see Pacific Gas & Elec. Co. v. Energy Resources Conservation and Dev. Comm'n., 461 U.S. 190, 204 [103 S.Ct. 1713, 1722, 75 L.Ed.2d 752, 765] (1983), or if federal law so thoroughly occupies a legislative field '"as to make reasonable the inference that Congress left no room for the States to supplement it."'  Fidelity Federal Savings & Loan Assn. v. De la Cuesta, 458 U.S. 141, 153 [102 S.Ct. 3014, 3022, 73 L.Ed.2d 664, 675] (1982) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. [218,] at 230 [67 S.Ct. 1146, at 1152, 91 L.Ed. 1447, at 1459 (1947)])."

"Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation."  Louisiana Pub. Serv. Comm. v. Fed. Communications Comm. (1986), 476 U.S. 355, 369, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369, 382.

The key question in any preemption analysis is whether Congress intended for state law to be superseded by federal law. Cipollone, 505 U.S. at    , 112 S.Ct. at 2617, 120 L.Ed.2d at 422.  However, "[c]onsideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by *** Federal Act unless that [is] the clear and manifest purpose of Congress.'"  Id., quoting Rice, 331 U.S. at 230, 67 S.Ct. at 1152, 91 L.Ed. at 1459.  "If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent."  Easterwood, 507 U.S. at    , 113 S.Ct. at 1737, 123 L.Ed.2d at 396.  Further, "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted."  Cipollone, 505 U.S. at    , 112 S.Ct. at 2618, 120 L.Ed.2d at 423.

Since the FRSA contains an express preemption clause, Section 434, there is no need to look beyond the text of that clause to determine if Congress intended for appellants' claims to be preempted.2

B

Prior to the United States Supreme Court's recent decision in CSX Transp. Corp. v. Easterwood, supra, some courts had tended to take the view that Section 434 evidences a Congressional

intent to preempt most state regulations and standards, almost to the point of applying a presumption in favor of preemption whenever Section 434 is at issue. For example, in Missouri Pacific RR. Co. v. RR. Comm. of Texas (W.D.Tex.1987), 671 F.Supp. 466, affirmed (C.A.5, 1988), 850 F.2d 264, the court conducted an analysis of Congressional intent behind Section 434. The court concluded that "it is clear that Congress intended to establish uniform national rail safety standards. Courts that have considered the phrase in the entire context of section 434, have read it as a narrow exception to a broad preemption of state regulation in rail safety matters. National Ass'n. of Regulatory Commissioners v. Coleman, 542 F.2d 11, 13 (3d Cir.1976); Donelon v. New Orleans Terminal Co., 474 F.2d 1108 (5th Cir.1973); Consolidated Rail Corp. v. Pennsylvania Public Utility Comm'n, 536 F.Supp. 653, 657 (E.D.Penn.1982); Atchison, Topeka & Santa Fe Railway Co. v. Illinois Commerce Commission, 453 F.Supp. 920, 926 (N.D.Ill.1977). In short, the statute evinces a total preemptive intent in rail safety matters, with very limited exceptions." Missouri Pacific RR. Co., 671 F.Supp. at 471.

We do not agree with this expansive interpretation of Section 434, at least insofar as the preemption of state common-law tort claims is at issue, as in the case before us. In spite of the fact that the railroad industry is heavily regulated, Easterwood underscores that the preemptive reach of Section 434 is not all-encompassing. Moreover, Easterwood establishes that a presumption against preemption is the appropriate point from which to begin an analysis of whether common-law tort claims are preempted: "In the interest of avoiding unintended encroachment on the authority of the States, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption." Easterwood, 507 U.S. at    , 113 S.Ct. at 1737, 123 L.Ed.2d at 396. There could be no better example of a subject which is "traditionally governed by state law" than a common-law tort claim.

III
A

In CSX Transp. Corp. v. Easterwood, supra, the United States Supreme Court considered the preemptive reach of Section 434, Title 45, U.S.Code, as it applied to areas of railroad safety. In Easterwood it was argued that regulations adopted by the Secretary of Transportation had preempted state common-law tort claims. The decision in Easterwood is instructive as we consider whether appellants' common-law tort claims are preempted by the FRSA.

In Easterwood, plaintiff's husband was killed when a train owned and operated by defendant CSX collided with decedent's truck at a Georgia crossing. Plaintiff alleged that CSX was negligent under Georgia law for, inter alia, failing to maintain an adequate warning device at the crossing, and for operating the train at an excessive speed. The district court granted summary judgment for defendant CSX on each claim, finding that both were preempted by the FRSA. See (N.D.Ga.1990), 742 F.Supp. 676, 678. Plaintiff appealed to the United States Court of Appeals for the Eleventh Circuit, which affirmed the district court's

determination that the claim based on the train's speed was preempted, but reversed on the allegation regarding warning devices, finding that claim not preempted. See (C.A.11, 1991), 933 F.2d 1548, 1553-1556.

The United States Supreme Court then granted certiorari to determine whether certain regulations adopted by the Secretary of Transportation regarding speed and grade crossings "cover[ed] the subject matter" of plaintiff's state tort claims in reference to Section 434, Title 45, U.S.Code, so that plaintiff's claims were preempted. The Easterwood court began its analysis by finding that "[l]egal duties imposed on railroads by the common law fall within the scope of" Section 434's preemption language regarding any state "law, rule, regulation, order, or standard relating to railroad safety." 507 U.S. at     , 113 S.Ct. at 1737, 123 L.Ed.2d at 396-397. The Supreme Court thus determined that, in the appropriate case, a state common-law tort claim can be within the preemptive reach of Section 434.

In determining whether the regulations adopted by the Secretary regarding crossing warning devices covered the subject matter of plaintiff's claims, the Easterwood court examined the terms and natures of the relevant regulations. One of those regulations established the terms under which states could use federal aid to eliminate highway hazards. Another regulation required states to employ warning devices at grade crossings conforming to standards set out in a Federal Highway Administration manual.

Easterwood court found that the regulation regarding terms under which states could eliminate hazards by using federal aid did not cover the subject matter of, and therefore did not preempt, plaintiff's claim. The Supreme Court stated: "In light of the relatively stringent standard set by the language of [Section] 434 and the presumption against pre-emption, and given that the regulations provide no affirmative indication of their effect on negligence law, we are not prepared to find pre-emption solely on the strength of the general mandates of [the regulation]." 507 U.S. at     , 113 S.Ct. at 1739-1740, 123 L.Ed.2d at 399. In addition, the court found the regulation requiring warning devices to comply with standards set out in the government manual did not preempt plaintiff's claim. Id., 507 U.S. at     , 113 S.Ct. at 1740, 123 L.Ed.2d at 399-400.3

The Supreme Court also affirmed the court of appeals as to plaintiff's claim based on excessive speed, finding that claim preempted. The court determined that the regulation promulgated by the Secretary setting train speed limits covered the subject matter of plaintiff's claim that CSX breached a common-law duty to operate the train at a safe rate of speed: "Understood in the context of the overall structure of the regulations, the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort which [plaintiff] seeks to impose on [CSX]." Id., 507 U.S. at     , 113 S.Ct. at 1742, 123 L.Ed.2d at 402-403.

B

In Hatfield v. Burlington N. RR. Co. (C.A.10, 1992), 958 F.2d 320, vacated and remanded (1993), 508 U.S.     , 113 S.Ct. 1940, 123 L.Ed.2d 646, for further consideration in light of CSX

Transp. Inc. v. Easterwood, the plaintiff claimed that the railroad was negligent for failing to install an adequate warning device at a crossing. The court of appeals held that, pursuant to Section 434, the Secretary's regulations regarding grade crossings preempted any state law relating to grade crossing safety devices, and stated that "the Secretary has absolved railroads from complying with duties imposed by state law regarding safety devices at grade crossings. Without such a duty, a railroad cannot be liable in common law negligence for failure to provide adequate safety devices at a grade crossing." Id., 958 F.2d at 324. The court of appeals stated that "[t]he hit-or-miss common law method [of jury trials to enforce state common law standards of care] runs counter" to the scheme embodied by the Secretary's regulations on rail crossings. Id., 958 F.2d at 324. The Supreme Court in Easterwood, in the course of invalidating the holding in Hatfield, specifically addressed, and disapproved of, that statement, recognizing that state tort law can be compatible with federal regulations, and that "the scheme of negligence liability could just as easily complement [the] regulations." Easterwood, 507 U.S. at    , 113 S.Ct. at 1739, 123 L.Ed.2d at 399.4

IV

A

We next employ an analysis similar to that employed in Easterwood to determine whether the Secretary's regulations "cove[r] the subject matter" of appellants' tort claims against appellees pertaining to tank car specifications.

In Easterwood, the court stated the issue before it as "whether the Secretary of Transportation has issued regulations covering the same subject matter as Georgia negligence law pertaining to the maintenance of, and the operation of trains at, grade crossings." 507 U.S. at    , 113 S.Ct. at 1738, 123 L.Ed.2d at 397. The court observed that "[t]o prevail on the claim that the regulations have pre-emptive effect, petitioner must establish more than that they 'touch upon' or 'relate to' that subject matter[;] *** pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." Id.

Therefore, to prevail in this case, appellees must establish that the federal regulations "substantially subsume" the subject matter of appellants' tort claims. The applicable preemption provision must be read narrowly "in light of the presumption against pre-emption of state police power regulations." Cipollone, 505 U.S. at    , 112 S.Ct. at 2618, 120 L.Ed.2d at 424.

B

In the case at bar, it is apparent that the Secretary's regulation requiring that non-pressure tank cars which haul hazardous materials must have reinforcing pads between external attachments and the shell of the car (Section 179.200-19[b], Title 49, C.F.R.) would "cove[r] the subject matter" of, and therefore preempt, any claim regarding the sufficiency of the reinforcing pads of a tank car manufactured after 1971. That regulation places a duty on tank car manufacturers to use the

reinforcing pads, and sets out the specifications which must be followed when the pads are welded in place between the attachment brackets and the tank car shells. However, UTLX 79499 was manufactured in 1966, and thus Section 179.200-19(b) does not directly apply to it. Instead, the specific question we address is whether the Secretary's regulation upon which appellees rely, providing that tank cars predating these specifications "may continue in use," Section 179.1(c), Title 49, C.F.R., covers the subject matter of appellants' claims.

We find that appellees have not overcome the presumption against preemption which accompanies any preemption inquiry. The mere general provision of Section 179.1(c), Title 49, C.F.R., that tanks mounted on or forming part of a tank car "built to specifications predating those in this part may continue in use" is not equivalent to an affirmative specific statement that the owner or operator of a tank car built prior to 1971 is under no duty to retrofit with reinforcing pads; and is also not equivalent to the further specific statement that one who does not retrofit a pre-1971 built tank car with reinforcing pads is shielded from liability under state tort law. Due to its lack of specificity, Section 179.1(c) does not "cove[r] the subject matter" of appellants' claims. This regulation does not specifically address, and so does not "substantially subsume," the subject matter of appellants' tort claims. We thus liken this regulation to the regulations pertaining to grade crossings at issue in Easterwood. As in Easterwood, "[i]n light of the relatively stringent standard set by the language of [Section] 434 ***, we are not prepared to find pre-emption solely on the strength" of a general provision, Easterwood, 507 U.S. at    , 113 S.Ct. at 1739-1740, 123 L.Ed.2d at 399, in this case Section 179.1(c), Title 49, C.F.R.

Section 179.1(c) allowed UTLX 79499 to continue in use without reinforcing pads. We think it likely that the regulation would have preempted any effort by the state of Ohio to enact a state law or adopt a state regulation which required reinforcing pads on tank cars, such as UTLX 79499, built before 1971. However, we draw a distinction between state regulation and common-law tort claims in this circumstance. Reliance upon the mere statement that UTLX 79499 could "continue in use" is insufficient to insulate appellees from tort liability. We believe that Congress could not have intended such an imprecise provision to have the sweeping consequences which would result from a finding that the regulation "cover[s] the subject matter" of appellants' claims. "The term 'covering' is *** employed within a provision [Section 434] that displays considerable solicitude for state law ***." Easterwood, 507 U.S. at    , 113 S.Ct. at 1738, 123 L.Ed.2d at 397. Appellees may have established that the regulation "touches upon" or "relates to" the subject matter of appellants' claims. See id. However, appellees must do more. They must establish that the regulation "substantially subsume[s]" the subject matter. That they have not done. Section 179.1(c), Title 49, C.F.R. does not cover the subject matter of appellants' state common-law tort claims and therefore does not preempt them.5

C

The analysis employed by the Easterwood court in determining that plaintiff's claim in that case based on excessive speed was preempted does not require a different result in this case. In Easterwood, the court noted that the Secretary has adopted regulations specifically addressing the maximum speed limits at which trains may travel. 507 U.S. at    , 113 S.Ct. at 1742, 123 L.Ed.2d at 402. Plaintiff claimed that the train involved in the accident was going too fast, even though the train was traveling at a speed below the allowable maximum. The court acknowledged that "[o]n their face, [the regulations] address only the maximum speeds at which trains are permitted to travel ***," but went on to determine that plaintiff's excessive speed claim was preempted. Easterwood, 507 U.S. at    , 113 S.Ct. at 1742, 123 L.Ed.2d at 402-403.

The way the court arrived at its determination compels us to find that plaintiff's excessive speed claim in Easterwood is distinguishable from appellants' claims in the case before us. In Easterwood, the court determined that the Secretary had adopted safety regulations which indicated that speed limit regulations "were adopted only after the hazards posed by track conditions were taken into account." 507 U.S. at    , 113 S.Ct. at 1742, 123 L.Ed.2d at 402. The court found plaintiff's claim preempted only after the speed limit regulation was "[u]nderstood in the context of the overall structure of the regulations ***." Id. The court went on to observe that "safety regulations established by the Secretary concentrate on providing clear and accurate warnings of the approach of oncoming trains to drivers. Accordingly, the Secretary's regulations focus on providing appropriate warnings given variations in train speed." (Footnote omitted.) Id., 507 U.S. at    , 113 S.Ct. at 1742-1743, 123 L.Ed.2d at 403. The court, in a footnote, quoted from U.S. Dept. of Transportation, Railroad-Highway Safety, Part I (1991): A Comprehensive Statement of the Problem, at iv: "[A]ny effective program for improving [crossing] safety should be oriented around the driver and his needs in approaching, traversing, and leaving the crossing site as safely and efficiently as possible[.]" Easterwood, 507 U.S. at    , 113 S.Ct. at 1743, 123 L.Ed.2d at 403, fn. 14.

Thus, the court determined that the Secretary, when adopting safety regulations, had chosen to focus on warning drivers of a train's approach, rather than focusing on speed limits, because rail crossing safety is not greatly affected by speed limits. The Secretary's speed limit regulations covered the subject matter of plaintiff's claim only because the speed limits were one part of an overall scheme to improve safety at crossings, and "the limits *** were set with safety concerns already in mind." Easterwood, 507 U.S. at    , 113 S.Ct. at 1743, 123 L.Ed.2d at 403. Plaintiff's claim in Easterwood therefore was preempted because the Secretary's regulation directly addressed the maximum speeds at which trains could safely travel, and plaintiff's claim alleged that the defendant railroad was negligent, even though the train was traveling below the speed limit set by the Secretary.6

V

Having established that the court of appeals below erred in

determining that appellants' claims are preempted, we next resolve whether this cause should be remanded to the court of appeals for further consideration, or should be remanded to the trial court for a new trial.

Appellees in this case moved for summary judgment at trial, urging that appellants' claims were preempted by federal law. Although the trial court overruled those motions, the trial court did later grant directed verdicts in favor of both appellees. The court of appeals based its decision to affirm the trial court on the determination that appellants' claims were preempted. Thus, the court of appeals did not consider whether the directed verdicts were proper. However, the court of appeals observed: "Although the trial court's rationale for directing the verdicts was not couched in terms of federal preemption, the concept of federal preemption nevertheless appears to have influenced its determination that UTC and A&W, as a matter of law, were not negligent."

Our review of the record leads us to agree with this characterization of the trial court's judgment. While the trial court did not expressly base its decision on preemption, it is obvious that preemption analysis did play a significant role in the trial court's determination that appellees were not negligent. For example, it is apparent that the fact that UTC complied with all federal regulations regarding tank cars was a significant factor underlying the trial court's determination that UTC exercised ordinary care. However, as was discussed above, appellees' compliance with a nonspecific regulation (Section 179.1[c], Title 49, C.F.R.) does not preempt appellants' claims and also does not conclusively insulate UTC from liability. For that reason, appellants' claims against UTC must be remanded for a new trial.

In addition, while the trial court directed a verdict in A&W's favor because it determined that appellants were unable to prove that A&W "should reasonably have known that the tank car was unsafe for the use to which it was put," it is apparent that the trial court's view of federal preemption also played a role in the decision that A&W was not negligent. Just as compliance with applicable federal regulations does not in and of itself insulate UTC from liability, compliance with the regulations does not insulate A&W either. The terms of the lease between UTC and A&W make A&W responsible for determining whether any car leased by it is appropriate for transporting the intended material. Therefore, questions remain regarding A&W's negligence, so that appellants' claims against A&W must be remanded for a new trial.7

In summary, we find that appellants' claims are not preempted by federal law. We reverse the judgment of the court of appeals and remand this cause to the trial court for further proceedings consistent with this opinion.

                    Judgment reversed
                    and cause remanded.

A.W. Sweeney, Acting C.J., Douglas, Resnick, F.E. Sweeney and Pfeifer, JJ., concur.

Christley and Wright, JJ., dissent.

Judith A. Christley, J., of the Eleventh Appellate District, sitting for Moyer, C.J.

FOOTNOTES:

1  We find it unnecessary to consider the impact of the "saving clause" set forth in the final sentence of Section 434, Title 45, U.S.Code, which provides:  "*** A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce."

2  Since we find that appellants' claims are outside the preemptive reach explicitly set out by Congress in Section 434, we do not consider whether some other type of federal preemption, i.e., implicit preemption, applies in this case.  If appellants' claims are beyond the preemptive reach of Section 434, they are also beyond the preemptive reach of the FRSA.  See Cipollone, 505 U.S. at    , 112 S.Ct. at 2625, 120 L.Ed.2d at 432-433, Blackmun, J., concurring ("We resort to principles of implied pre-emption *** only when Congress has been silent with respect to pre-emption.").

3  The Easterwood court did find that common-law claims based on inadequate warning devices would be preempted in some circumstances.  The Supreme Court found that "for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection.  The Secretary's regulations therefore cover the subject matter of state law ***."  507 U.S. at      , 113 S.Ct. at 1241, 123 L.Ed.2d at 401.

4  On remand, the Hatfield court recognized that the Supreme Court's decision in Easterwood regarding the preemptive reach of Section 434 was influenced by "the Court's reliance upon a presumption against preemption."  Hatfield v. Burlington Northern RR. Co. (C.A.10, 1993), 1 F.3d 1071, 1072.

5  If we were to analyze this case under the "inconsistency" preemption provision of the HMTA, former Section 1811(a), Title 49, U.S.Code, we would also find that appellants' claims are not preempted.  Our determination that Section 179.1(c), Title 49, C.F.R. does not cover the subject matter of appellants' claims leads to the further conclusion that appellants' claims are not "inconsistent" with that regulation.  Subjecting appellees to potential tort liability under appellants' common-law claims is not inconsistent with the terms of a regulation stating merely that tank cars such as UTLX 79499 "may continue in use."

6  Footnote 15 of the court's opinion is most revealing in this regard.  The court states there that "[defendant] is prepared to concede that the pre-emption of [plaintiff's] excessive speed claim does not bar suit for breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard. *** As [plaintiff's] complaint alleges only that [defendant's] train was traveling too quickly given the 'time and place,' *** this case does not present, and we do not address, the question of FRSA's pre-emptive effect on such related claims."  Easterwood, 507 U.S. at    , 113 S.Ct. at 1743, 123 L.Ed.2d at 404, fn. 15.

      It would appear in light of this comment that some claims relating to speed of a train may not be preempted, i.e., a claim

involving the breach of a duty to slow or stop a train to avoid a specific, individual hazard. Such a claim apparently would present an entirely different situation than that presented in Easterwood. In that differing situation, the "subject matter" of a plaintiff's claim would be much narrower, and the court expressed no opinion whether the claim would be preempted.

7 Our holding in this case is limited to a determination that appellants' claims are not preempted. We remand the cause to the trial court for a new trial, rather than remanding to the court of appeals for consideration of the propriety of the trial court's directed verdict, because in our view the concept of federal preemption played too great a role in the trial court's decision to direct a verdict in favor of appellees. Of course, we make no comment regarding the merits of appellants' claims.

Christley, J., dissenting. I respectfully dissent from the majority opinion because I believe its decision is contrary to the logic and rationale set forth by the United States Supreme Court in its recent opinion in CSX Transp., Inc. v. Easterwood (1993), 507 U.S.    , 113 S.Ct. 1732, 123 L.Ed.2d 387.

A review of the applicable federal statutory and regulatory provisions, in light of Easterwood, leads me to conclude that appellants' claims against appellees are pre-empted by the Federal Railroad Safety Act of 1970, as amended ("FRSA"). I would, therefore, affirm the decision of the court of appeals below.

Initially, I note that I agree with the following determinations of the majority: that Section 434 of the FRSA contains the controlling pre-emption provision in this matter, that a state common-law tort claim can be within the pre-emptive reach of Section 434, and that the Easterwood case controls our analysis. However, despite the presumption against pre-emption of subjects traditionally governed by state law, I believe that the analytical framework put forth in Easterwood requires a finding of pre-emption in this case.

In Easterwood, the court determined that FRSA does not, on its face, pre-empt state common-law tort causes of action involving the transportation of hazardous material by rail. Rather, the court held that under FRSA, if it can be shown that the relevant federal law and regulations "cover[ed] the same subject matter" of the state cause of action, pre-emption will lie. Easterwood, 507 U.S. at    , 113 S.Ct. at 1738, 123 L.Ed.2d at 397.

In 1970, Congress enacted FRSA:

"*** to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons and to reduce damage to property caused by accidents involving any carrier of hazardous material." Section 421, Title 45, U.S. Code.

The Act required the Secretary of Transportation to prescribe appropriate rules, regulations, orders, and standards for all areas of railroad safety. Section 431, Title 45, U.S. Code. As noted above, the Act also contained the following express pre-emption provision:

"The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or

standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not an undue burden on interstate commerce." (Emphasis added.) Section 434, Title 45, U.S. Code.

In Easterwood, the court concluded that the issue before the court was "whether the Secretary of Transportation has issued regulations covering the same subject matter as Georgia negligence law pertaining to the maintenance of, and the operation of trains at grade crossings." Easterwood, 507 U.S. at , 113 S.Ct. at 1738, 123 L.Ed.2d at 397. The court went on to define the phrase "covering the subject matter" to mean that "pre-emption will lie only if the federal regulations substantially subsume" the subject matter of the relevant state law. Id.

The defendant railroad in Easterwood argued that the regulations promulgated by the Secretary relating to train speed and grade crossings "cover[ed] the subject matter" of, and therefore pre-empted, the state common-law tort claims raised by the plaintiff.

As to the excessive-speed claim, the court determined that the Secretary, acting through the Federal Railroad Administration, promulgated regulations in 1971 under FRSA, setting maximum train speeds for different classes of track. The court held that the regulations at Section 213.9(a), Title 49, C.F.R. adopted by the Secretary establishing maximum allowable operating speeds for different classes of track, pre-empted Easterwood's tort law claim of excessive speed. The regulations set the maximum train speed at the crossing in question at sixty miles per hour.

Although the train was being operated within the maximum allowable speed, plaintiff contended that defendant railroad nevertheless breached its common-law duty to operate its train at a moderate and safe rate of speed.

The court determined that, on their face, the federal regulations setting maximum allowable operating speeds "address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate." (Emphasis added.) Id., 507 U.S. at , 113 S.Ct. at 1742, 123 L.Ed.2d at 402.

In arguing against a finding of pre-emption as to her excessive-speed claim, plaintiff in Easterwood emphasized that the excessive-speed claim focused upon railroad safety as it related to the potentially hazardous conditions posed by grade crossings. Plaintiff argued that the regulations in Section 213, Title 49, C.F.R., establishing maximum allowable operating speeds for freight and passenger trains, were based on varying characteristics of the track itself (i.e., track geometry, track structure, the number and quality of crossties, etc.). Therefore, plaintiff argued that the Secretary's maximum-speed regulations only addressed railroad safety as it related to varying characteristics of the track, and did not cover the

subject matter of maximum train speeds as they "related to" safety conditions posed by grade crossings.

It was only because the state common-law tort claim (the state "requirement") appeared to "relate to" a different aspect of railroad safety than that addressed by Section 213, that the court then found it necessary to consider "related safety regulations adopted by the Secretary."  Id., 507 U.S. at    , 113 S.Ct. at 1742, 123 L.Ed.2d at 402.  By doing so, the court was able to conclude that the speed limits had been established only after taking into account the "hazards posed by track conditions," the precise subject matter of plaintiff's excessive-speed tort claim.  Id.

Thus, despite the fact that the Secretary's maximum speed limits "related to" differing track characteristics, the court nevertheless concluded that the speed limits also "cover[ed] the subject matter of train speed with respect to *** conditions posed by grade crossings."  Id., 507 U.S. at    , 113 S.Ct. at 1743, 123 L.Ed.2d at 403.

Applying the Easterwood analysis to the instant case leads to the proposition that appellants' claims against appellees are pre-empted only if the Secretary has adopted regulations which "cove[r] the subject matter" of safety standards for bottom attachments to railroad tank cars engaged in the transportation of hazardous material.  Examination of the Code of Federal Regulations concerning rail transportation of hazardous materials and, specifically, the regulation directly concerning brake attachments for railroad tank cars (Section 179.200-19, Title 49, C.F.R.) reveals that this section required that all tank cars manufactured after 1971 shall have reinforcing brake pads between the brake attachments and the tank shell.

However, Section 179.1(c) specifically exempts, or grandfathers, tank cars built prior to 1971 from this requirement.  The parties do not dispute that on the date of the Miamisburg derailment, UTLX 79499 was exempted from the regulatory requirement of reinforcing brake pads.

The record clearly demonstrates that the Secretary's tank car specifications pertaining to the transportation of hazardous materials "related to" a concern over the potential release of hazardous materials.  For better or worse, the Secretary determined that tank cars manufactured prior to 1971 do not need to be retrofitted with reinforcing pads where the brake attachments meet the shell of the tank car.

Had it been demonstrated that this exemption was based on safety concerns other than the risk of the release of hazardous materials, then an Easterwood analysis might require a further inquiry into the "overall structure of the regulations" to determine whether the exemption was established after taking into account the "related" safety concern of the release of hazardous materials.  However, unlike the court in Easterwood, there is no need for this court in its analysis to consider "the context of the overall structure of the regulations" in order to conclude that Section 179.1(c) was established with the safe transportation of hazardous materials by rail "already in mind."  Id., 507 U.S. at    , 113 S.Ct. at 1742-1743, 123 L.Ed.2d at 402-403.

The majority in the instant case states that:

"The mere general provision of Section 179.1(c), Title 49,

C.F.R., that tanks mounted on or forming part of a tank car 'built to specifications predating those in this part may continue in use' is not equivalent to an affirmative specific statement that the owner or operator of a tank car built prior to 1971 is under no duty to retrofit with reinforcing pads; and is also not equivalent to the further specific statement that one who does not retrofit a pre-1971 built tank car with reinforcing pads is shielded from liability under state tort law."

However, if the preceding rationale had been applied by the court in Easterwood, the result would have been that plaintiff's excessive-speed claim would not have been pre-empted by the federal regulations.  In other words, that court would have found that the "mere general provision" establishing maximum speed limits for different classes of track was not "equivalent to an affirmative specific statement" that a railroad is shielded from liability under state tort law if it fails to reduce the train's speed when approaching a grade crossing, where the train's speed is already below the maximum permitted by Section 213.9(a).

Thus, if the Easterwood court had employed the present majority's rationale, there would have been a finding of no pre-emption, as the two statements were not equivalent.  To the contrary, the Easterwood court, unlike the majority in the instant case, found that there was pre-emption without a finding of "equivalence."

Further, the Easterwood court found that "Section 434 does not *** call for an inquiry into the Secretary's purposes, but instead directs the courts to determine whether regulations have been adopted which, in fact, cover the subject matter of train speed."  Id., 507 U.S. at    , 113 S.Ct. at 1743, 123 L.Ed.2d at 403.

Pursuant to Section 179.1(c), Title 49, C.F.R., the Secretary has specifically authorized appellees to continue to transport hazardous materials in UTLX 79499 without being required to retrofit the tank car with reinforcement pads.8 Section 434, Title 45, U.S. Code, as applied to the instant action, permits a state such as Ohio to "adopt or continue in force" a tortious cause of action, such as the issue before us now, but only until the Secretary has adopted a regulation "covering the subject matter" of the common-law tort cause of action.

The majority concludes that the regulation specifically authorizing UTLX 79499 to continue to transport hazardous materials without having installed reinforcing pads between the brake attachments and the tank car shell "does not specifically address, and so does not 'substantially subsume,' the subject matter of appellants' tort claims."  The majority characterizes appellants' tort claim as an allegation "that phosphorous escaped because UTLX 79499 was not equipped with a reinforcing pad where the brake attachment connected to the shell of the tank car."

The majority, however, only grudgingly concedes that the regulation might "relate to" appellants' tort claims.  The majority finds it "likely" that Section 179.1(c) would pre-empt a state law or regulation "which required reinforcing pads on tank cars built before 1971."  The majority "draw[s] a distinction between state regulation and common-law tort claims in this circumstance."  However, Easterwood clearly rejects employing such a distinction for purposes of determining the pre-emptive

reach of Section 434.8

Therefore, I find it difficult to reach any other conclusion but that Section 179.1(c), Title 49, C.F.R., authorizing appellees' continued use of UTLX 79499 without a reinforcement pad retrofit, "substantially subsume[s]" or "*** embrace[s] in an effective scope of treatment" appellants' tort claims alleging negligence due to the failure to retrofit UTLX 79499 with a reinforcing pad. Id., 507 U.S. at    , 113 S.Ct. at 1738, 123 L.Ed.2d at 397. The majority concludes that "[r]eliance upon the mere statement that UTLX 79499 could 'continue in use' is insufficient to insulate appellees from tort liability." However, Easterwood, in effect, held that the defendant railroad's reliance on the "mere statement" that it could operate its train through a grade crossing at speeds up to sixty miles per hour was sufficient to insulate it from tort liability.

I fail to see any distinction between the maximum-speed regulation of Easterwood and the instant regulation explicitly authorizing UTLX 79499 to continue transporting hazardous materials without retrofitting with reinforcement pads, in terms of "cover[ing] the subject matter" of whether defendants owed plaintiffs any additional common-law duty of care.10

I must conclude, therefore, that the manner in which the court arrived at its pre-emption determination as to the excessive-speed claim in Easterwood supports rather than contradicts the conclusion that appellants' common-law tort claims are pre-empted under FRSA.

I, therefore, further conclude that the distinction drawn by the majority between the rationale employed in Easterwood and the rationale employed in the instant case is illusory.

Accordingly, I would affirm the appellate court and, therefore, dissent.

Wright, J., concurs in the foregoing dissenting opinion.

FOOTNOTES:

8 Furthermore, the Secretary, through his congressionally delegated agencies, has declined to require the retrofitting of pre-1971 tank car brake attachments, determining that no further action is warranted. See, e.g., Railroad Tank Car Research and Test Project, Phase 02 Report on Analysis of Non-Pressure Tank Car Behavior in Accidents, Association of American Railroads, Report No. RA-02-4-47, March 24, 1983: "The current DOT regulations for non-pressure tank cars prescribe design rules for assuring safe breakaway of attachments [par. 179.200-19]. Based on past performance, it is concluded that these rules are adequate."

9 "Legal duties imposed on railroads by the common law fall within the scope of [Section 434's] broad phrases." Id., 507 U.S. at    , 113 S.Ct. at 1737, 123 L.Ed.2d at 396-397.

10 If I were to analyze the Secretary's brake-attachment exemption for pre-1971 tank cars under the less imposing "inconsistency" standard of the HMTA pre-emption provision, it is evident that a state "requirement" that UTLX 79499 be retrofitted with reinforcing pads would be "inconsistent" with a federal standard expressly authorizing continued hazardous materials service without any such retrofit. See, e.g., S. Pac. Transp. v. Pub. Serv. Comm. of Nev. (C.A.9, 1990), 909 F.2d 352; Jersey Cent. Power & Light Co. v. Lacey Twp. (C.A.3, 1985), 772 F.2d

1103, certiorari denied (1986), 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305; Missouri Pacific RR. Co. v. RR. Comm. of Texas (C.A.5, 1988), 850 F.2d 264, certiorari denied (1989), 488 U.S. 1009, 109 S.Ct. 794, 102 L.Ed.2d 785.