## In re MIAMISBURG TRAIN DERAILMENT LITIGATION.

[Cite as *In re Miamisburg Train Derailment Litigation* (1993), 92 Ohio App.3d 304.]

Court of Appeals of Ohio,
Montgomery County.

No. 14014.

Decided Dec. 8, 1993.

306

*Coolidge, Wall, Womsley & Lombard* and *Robert P. Bartlett; Lindhorst & Dreidame* and *James L. O'Connell,* for appellants CSX Transportation, Inc. et al.

*Waite, Schneider, Bayless & Chesley* and *Stanley M. Chesley; Ruppert, Bronson, Chicarelli & Smith Co., L.P.A.,* and *James D. Ruppert; Gardner, Ewing & Souza* and *C. David Ewing; Ruschau, Lehman & Hobbs* and *Steve Ruschau; Hochman & Roach Co., L.P.A.,* and *James Hochman,* for appellees.

*William V. Johnson* and *William A. Geiser,* for Union Tank Car.

*Freund, Freeze & Arnold* and *Gordon D. Arnold,* for Union Tank Car.

*Rendigs, Fry, Kiely & Dennis* and *W. Roger Fry,* for Albright & Wilson and ERCO.

*Armistead W. Gilliam, Jr.,* Special Master.

FAIN, Judge.

Defendant-appellant CSX Transportation, Inc., CSX Corporation and its underwriters appeal from a judgment of the trial court authorizing disbursal of a settlement fund of approximately $10.5 million on a pro-rata basis to certain plaintiff class members. The trial court found that the class members who had sustained non-economic damages had a superior equitable interest in the undistributed settlement fund.

CSX maintains that the trial court erred as a matter of law when it found that the claiming class members with non-economic damages had an equitable interest in the fund after the final adjudication and release of their interests. Alternatively, CSX contends that even if the class members' interests were not fully adjudicated, the trial court erred when it found that the claiming class members had an equitable interest in the fund superior to that of CSX. Finally, CSX asserts that it did not lack standing to object to the special master's report and recommendation disposing of the residual fund as the trial court found.

We conclude that the trial court did not err as a matter of law; nor did the trial court abuse its discretion in awarding the class members the residual money in the settlement fund. The trial court correctly concluded that CSX lacked standing to object to the special master's report and recommendation disposing of the residual fund. Accordingly, the judgment of the trial court is affirmed.

## I

A class action was brought against CSX following a train derailment involving a phosphorus spill in July 1986. Trial to a jury on the issues of negligence and malice began in October 1990. In November 1990, counsel for the class and CSX executed a "Memorandum of Understanding of Settlement" within the presence of the trial court.

The settlement provided that CSX would pay $16 million in full settlement of all class claims against CSX. Additionally, the settlement agreement provided that CSX would play no role, advisory or otherwise, in the development of a protocol or the distribution of settlement funds; nor would CSX challenge any award of attorney fees and expenses ordered by the trial court. The written settlement agreement did not contain a provision disposing of any balance remaining after the determination and distribution of all claims. However, CSX acknowledged that it did not retain any right or "expectation" for the return of the $16 million it had paid into court to settle its liability.

The trial court directed a verdict in favor of the remaining defendants and proceeded to approve the settlement agreement. The trial court and class counsel took an active role and participated in the settlement fund distribution process.

A special master was appointed to implement the claims distribution process, which included claimants with economic and non-economic damages. The trial court retained jurisdiction over all matters. Less than 10,000 individuals filed claims, with the final aggregate award totaling less than $4 million. A balance of approximately $10.5 million remained in the fund after all the claimants had been paid and released their pending claims.

After the parties filed briefs addressing the issue of disposition of the remaining funds and CSX filed a brief addressing certain tax issues, in April 1993, the special master adopted and approved a pro-rata distribution formula for distributing the proceeds remaining in the settlement fund to the non-economic class members.

The special master concluded that the non-economic claiming class members (evacuation, emotional distress and minor personal injury claimants) had superior equitable interests in the remaining fund. The special master concluded that the amounts already awarded for minor personal injury, emotional distress and evacuation were "fair compensation," but were not full compensation for non-economic loss because the extent to which other claims would deplete the fund were unknown at the time of the initial distribution to these class members, so that the amounts previously awarded had been intentionally conservative. In May 1993, the trial court adopted the decision of the special master and found that CSX did not have standing to object to the special master's report.

From the judgment of the trial court, CSX appeals. The disbursal of the settlement fund was originally scheduled to take place on June 7, 1993. This court issued a stay of the order of the trial court authorizing the disbursal of funds until such time as the merits of the appeal could be decided.

This appeal is now before the court upon the merits.

## II

CSX's first assignment of error is as follows:

"The trial court erred in adopting an equitable principle never before accepted by any court which provides that claiming class members with non-economic loss whose interests have been adjudicated by final order and who have released all further interests in the class action settlement fund have an equitable interest in the fund even after the final adjudication and release of their interests, including non-economic loss."

The special master found that the balance of the equities did not favor a refund to CSX. CSX maintains that the claiming class members do not have an equitable interest in the residue of the settlement fund because the claiming class members with non-economic loss were compensated for their injuries, released their future interests and their interests were fully adjudicated by final order.

## A

CSX established the settlement fund, and all claims against CSX were dismissed. CSX acknowledges that the settlement agreement provides that CSX would play no role, advisory or otherwise, in the development of the protocol or

the distribution of settlement funds unless required by the court. The record indicates that at a hearing on the propriety of the settlement agreement, CSX stated that it *"retains no right or expectation* for the return of the funds placed on deposit." (Emphasis added.) This is a contemporaneous statement of the parties' intent not to reserve to CSX any right to a return of the funds.

 The phrase *expressio unius est exclusio alterius* means that the expression of one thing implies the exclusion of the other. *Anthony Carlin Co. v. Hines* (1923), 107 Ohio St. 328, 338, 140 N.E. 99, 102; *Cincinnati v. Cincinnati Reds* (1984), 19 Ohio App.3d 227, 230, 19 OBR 378, 381–382, 483 N.E.2d 1181, 1184. The settlement agreement provides for a reversion of the settlement funds to CSX upon the occurrence of two events: (i) failure by the trial court to certify the class; or (ii) failure to approve the reasonableness of the settlement agreement. Both of these conditions would frustrate the underlying purpose of settling CSX's liability to the plaintiff class. This shows an intent of the parties not to permit reversion of any future remaining funds to CSX once the class has been certified and the settlement has been approved. The specification of two events permitting reversion of the fund without specifying any other events permitting reversion shows an intent to exclude reversion of the fund upon the happening of other occurrences, such as the existence of undistributed funds after the claims are paid. Therefore, we conclude that CSX has no legal right to the return of the money in the settlement fund.

 The non-economic class asserts that it is the legal owner of the settlement fund. In our view, the entire class continued to own the fund after individual class members had received compensation and executed releases. Because CSX had already renounced any interest or expectation in the fund, the releases executed by the compensated class members were not intended to benefit CSX, which had already been released from any liability beyond the $16 million it had already paid. The evident purpose of the individual releases was to release each individual's claim as against the collective interest of the entire class in the remaining funds. Had an individual class member subsequently claimed entitlement to a larger share of the settlement fund, that individual's release could and should have been used by the class, collectively, to bar that claim to a larger share. The individual releases were not intended to benefit CSX, which already had the benefit of a release from the entire class. When it became evident that more funds were available for distribution to the class, CSX was in no position to rely upon the individual releases.

## B

 Even if we were to find that the class had no legal interest in the money remaining in the settlement fund after payment of the initial claims, we would

still find that the members of the class have a superior equitable interest in this money.

In the case before us, the only parties to this action include CSX and the claiming class members. CSX contends that since it provided the money for the settlement fund, equitably it should be entitled to a refund of any surplus in the fund after all of the plaintiff class members have been adequately compensated.

At first thought, CSX's superior equitable interest to a return of any surplus in the settlement fund after all of the plaintiff class members have been adequately compensated appears virtually self-evident. However, we are not persuaded that this would be a fair, or equitable, result under the circumstances of this case.

Both parties agree that the $16 million figure was intended to be an estimate, resulting from extensive and vigorous negotiations, of the amount that would just be sufficient to compensate each class member fully and fairly. The plaintiff class contends, and CSX does not deny, that it proposed a deal in which a substantially larger amount of money would be paid into a settlement fund by CSX, but CSX would be entitled to a refund of any surplus remaining in the fund after the payment of all claims; however, CSX rejected that proposal. The essence of the deal that CSX and the class entered into was that the *class* assumed the risk that the $16 million paid by CSX to settle the claims against it would be insufficient to compensate each class member fully and fairly. Conversely, *CSX* assumed the risk that the $16 million paid by it would be more than enough to pay all claims.

We cannot distinguish this case from any garden-variety tort case where a settling defendant, after agreeing to settle his liability for a stipulated amount, paying the money into court, and obtaining a release from the plaintiff, wishes to claim subsequently that he has paid too much to settle his liability. No matter how convincingly the defendant might argue that he has paid too much, his protestations would receive no more consideration than would the plaintiff's contrary protestations that he has been paid too little.

Therein lies the unfairness, or inequity, of CSX's position. Had more claims been made than had been anticipated, so that each individual claimant could not receive all of the compensation to which he was entitled, CSX would not have been liable for the deficiency in the settlement fund, because the essence of the deal was that CSX had liquidated its liability at $16 million, the plaintiff class having assumed the risk that $16 million would not be sufficient to pay all claims. The plaintiff class, by virtue of the settlement agreement, would be stuck with the shortfall in that case. Conversely, when the claims turned out to be fewer than had been anticipated, so that the $16 million was more than enough to pay all claims, it was CSX, not the class, that assumed that risk. The plaintiff class having assumed the risk of a shortfall, it is fair and equitable that the class

receive the benefit of the windfall that has apparently resulted from the settlement in this case.

### C

CSX relies upon *Wilson v. Southwest Airlines, Inc.* (C.A.5, 1989), 880 F.2d 807, for the proposition that the class does not have an equitable interest in the fund because class members have released their interests. *Wilson* does not stand for the proposition that because claiming class members have released their interests in a fund, the class members no longer have any equitable right to the balance in the fund as a matter of law. In *Wilson* the employer and the class counsel were vying for the remainder of the funds. Class counsel sought additional attorney fees for uncompensated hours from the fund and the employer opposed the request and sought return of the balance. The trial court rejected the claims of both the employer and the class counsel to the balance of the settlement funds and ordered that the residue be distributed to a charity under the *cy-pres* doctrine.

By the time the case was argued on appeal, the defendant employer and the plaintiff class counsel had reached agreement as to a fair and equitable manner of dividing the residue between them. Thus, the posture in which the case reached the court of appeals was one in which a complete stranger to the litigation—the charity to whom the trial court had awarded the balance of the funds—was competing with parties and counsel to the litigation, who had worked out among themselves a fair division of the remaining funds. The court of appeals held that both the defendant employer and the plaintiff class counsel had persuasive equitable claims to the residual funds, in contrast to the charity, which was a total stranger to the litigation. Therefore, the award of the fund to a charitable organization was held to have constituted an abuse of discretion.

In the case before us, unlike in *Wilson,* the contest is not with a complete stranger to the litigation, and the parties have not stipulated that a partial return to the defendant of the surplus in the fund is fair and equitable. We conclude that *Wilson* is distinguishable.

The appellate court concluded that the district court's order in *In re Folding Carton Antitrust Litigation* (C.A.7, 1984), 744 F.2d 1252, applying the *cy-pres* doctrine, was an abuse of discretion.

The court found that neither the defendants nor class counsel had convincing equitable claims because the fund was established to pay late claims and to meet various expenses. Thus, only the nonclaiming class had equitable rights to the fund.

The court held that the application of the *cy-pres* doctrine was unnecessary and inappropriate, in part because the original remedy had already substantially achieved the purposes of the Sherman Antitrust Act. The court ordered that the remainder escheat to the United States.

The purpose of the fund in *Folding Carton* was to pay late claims and various expenses. We conclude that the facts of *Folding Carton* are distinguishable from the facts in the case before us.

CSX's first assignment of error is overruled.

### III

CSX's second assignment of error is as follows:

"Assuming *arguendo* that the interests of claiming class members with non-economic loss were not previously finally adjudicated, the trial court erred in prioritizing the equitable interests of these claiming class members vis-a-vis those of the settling defendants in the fund."

Alternatively, CSX claims that the trial court erred in giving the class members' equitable interests a higher priority than CSX's equitable interest in the fund because it failed to apply the correct law.

The issue before this court is whether the trial court abused its discretion in awarding the remainder of the settlement fund to the non-economic claiming class members. In its final order the trial court rejected CSX's equitable arguments that the class was fully compensated. The trial court noted that the issue of punitive damages would have gone to the jury had the case not been settled, and that CSX stood to receive preferential income tax treatment on the condition that it not retain a beneficial interest in the income or corpus of the fund. The court further found that to refund the money to CSX would defeat the expectations of the parties and would frustrate the public policy favoring negotiated settlement of litigation.

Because trial courts are given broad discretionary powers in shaping equitable decrees, appellate review is narrow. *Van Gemert v. Boeing Co.* (C.A.2, 1984), 739 F.2d 730, 737. The trial court has broad discretion in determining the disposition of undistributed class action settlement funds. *Six Mexican Workers v. Arizona Citrus Growers* (C.A.9, 1990), 904 F.2d 1301, 1307; *Van Gemert v. Boeing Co.*, 739 F.2d at 737; *In re "Agent Orange" Prod. Liability Litigation v. Dow Chem. Co.* (E.D.N.Y.1985), 611 F.Supp. 1396, 1402; *Beecher v. Able* (C.A.2, 1978), 575 F.2d 1010, 1011.

" 'To what extent, if at all, the applicant should be reimbursed out of the earnings and the undistributable residue of the fund, will depend, we think, upon

the circumstances of the particular case, and must be left largely to the sound judgment and discretion of the court which is charged with the distribution.'" *Van Gemert v. Boeing Co.*, 739 F.2d at 737, quoting *Panhandle E. Pipe Line Co. v. Fed. Power Comm.* (C.A.8, 1949), 179 F.2d 896, 902.

In both *Wilson* and *Folding Carton*, the reviewing court looked to see whether the district court abused its discretion in distributing the remaining balance of a settlement fund.

█ An abuse of discretion is more than an error of law or judgment; it implies an attitude on the part of the trial court that is unreasonable, arbitrary or unconscionable. *Marks v. C.P. Chem. Co.* (1987), 31 Ohio St.3d 200, 201, 31 OBR 398, 398–399, 509 N.E.2d 1249, 1251; *Ojalvo v. Bd. of Trustees of Ohio State Univ.* (1984), 12 Ohio St.3d 230, 232, 12 OBR 313, 314–315, 466 N.E.2d 875, 876; *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 172–173, 404 N.E.2d 144, 148.

So long as there is no abuse of that discretion, the trial court's decision on distribution is binding. The broad general powers of the court are enhanced in the case before us by the settlement agreement's providing that the trial court was to retain jurisdiction over all matters, including the settlement agreement, the parties thereto and the enforcement thereof, the fund, and the administration of the settlement.

█ When determining whether a party has a substantial equitable claim on the remainder of a fund, the purpose of the fund and whom it was to benefit must first be examined. *Wilson*, 880 F.2d at 812. Additionally, the nature of the wrong and the nature of the action are considered.

█ An agreement containing a provision that no portion of the settlement fund would revert to the defendant, regardless of the number or amount of claims allowed, is an assumption of the risk that the estimated number and amount might be incorrect; and, an error in that estimate is no basis for granting a rescission of the settlement agreement. Furthermore, there is no basis for setting aside a settlement agreement where the agreement proves to be more beneficial to a plaintiff class than to the defendant. It is incumbent upon the district court to allocate proceeds of the settlement agreement among class members equitably. *Beecher v. Able*, 575 F.2d at 1015–1016.

In the present case, the purpose of the fund was to provide compensation to the victims of the July 1986 train derailment in Miamisburg, Ohio. The pertinent provision of the settlement agreement provides as follows:

"By signing this Settlement [Agreement] and paying the amount agreed upon herein, the CSX defendants do not admit liability. Furthermore it is agreed that

the Fund does not constitute payment of punitive damages but constitutes a resolution of a disputed claim with regard to compensatory damage claims asserted by the plaintiffs' class."

As noted in the Master's Report and Recommendation of April 7, 1993, at 17, had this case not settled, the trial court would have submitted the issue of punitive damages to a jury. Even though the settlement agreement provides that the fund did not represent an award to the class of punitive damages, the agreement released the punitive damage claims that otherwise would have gone to a jury. The special master found that with the exception of awards for economic loss and major medical claims above $30,000, the awards for minor physical injury, emotional distress and evacuation were conservative and were not intended to compensate claimants fully for intangible injuries such as pain and suffering, emotional distress and the inconvenience suffered by an evacuee. The protocol for distribution was conservative because the extent to which pending wrongful death actions and other major medical claims would deplete the fund was unknown. Therefore, the awards represented a minimum level of fair compensation but did not fully and completely compensate claimants for inconvenience, pain and suffering; to this extent, the purpose of the fund remained unfulfilled after the initial payments.

Because the awards did not represent full and complete compensation to claimants for their injuries resulting from the derailment, the special master concluded that the equities of the case did not support a refund of the undistributed settlement amount to CSX. The special master concluded that distributing the funds to the claiming class would not result in a windfall to the class, but would render a fair and reasonable amount. This supports the conclusion that the purpose of the fund was not completely fulfilled, and that the money in the settlement fund did not represent purely excess funds, but rather represented undistributed, supplemental money belonging to the class.

Furthermore, the following discourse took place during an in-chambers conference at the time the parties executed the settlement agreement:

"MR. CHESLEY: Additionally, it is clearly understood that this money becomes the property of the class * * * and there is no requirement whatsoever nor is there any right of Defendant CSX to receive monies back no matter what the situation is in regard to the size of the class or number of claimants, and we would ask that this [Settlement Agreement] be part and parcel of this transcript and that this would memorialize the understanding of all the parties.

"MR. O'CONNELL: On behalf of * * * CSX, I can state for the record that * * * CSX is prepared to sign and will sign the Settlement [Agreement] subject to certain ratification by the Officers and/or Board of Directors of CSX.

"I should point out with respect to one of the last comments made by Mr. Chesley that the ultimate disposition of the fund does remain under the control of the Court for whatever appropriate purposes the Court might ultimately make of the fund.

"MR. CHESLEY: Except returning it to CSX.

"MR. BARTLETT: Why is that included? If you have Five Million Dollars worth of claims and Sixteen Million Dollars—

"MR. CHESLEY: I want to make sure we have this understanding. Your Honor, I don't want to have—we negotiated this in good faith.

"THE COURT: Do you want this on the record?

"MR. CHESLEY: Yes. This was negotiated in good faith. I don't want any expectations by CSX that they are going to get money back. I believe that it is inappropriate, and it is the understanding of the settlement and the reason we made the compromise we did is there would be no get back.

"What I am concerned with now, I want to make it clearly understood that while the Court has the ultimate authority, the Plaintiffs would resoundly oppose the right of the Defendant to recover any monies back. That just is tantamount to being contrary to the understanding of the terms and conditions of this fund.

"Here's the problem, Your Honor. Off the record.

"(WHEREUPON, an off-the-record discussion was had.)

"THE COURT: Back on the record. The statement by Mr. Chesley that as part and parcel of this memorandum, albeit the Court perceives this to be included within the spirit of the agreement, if not specifically delineated therein, that upon the payment of these funds for the use of the Court and with Plaintiff Class in the payment of various claims, *CSX retains no right or expectation for the return of the funds placed on deposit.*

"MR. CHESLEY: That's fine.

"MR. O'CONNELL: Defendant CSX interprets the agreement in the same fashion as the Court." (Emphasis added.)

CSX expressly renounced any right or expectation for the return of the money in the settlement fund. CSX was assured of an upper limit on its possible liability. The class bore the risk of being under-compensated for its injuries.

After thorough consideration of the above factors, the trial court found that the balance of the equities did not favor a refund to CSX. The trial court found that the distribution formula recommended by the special master was within the range of reasonable compensation to the victims of the train derailment. We cannot say

that the trial court abused its discretion when it awarded the balance of the settlement fund to the claiming class.

CSX's second assignment of error is overruled.

## IV

CSX's third assignment of error is as follows:

"The trial court erred in deciding that appellants lacked standing to object to the master's report disposing of the residue of a fund left after payment of all claims, which fund appellants had placed on deposit for the purpose of payment of those claims."

 The trial court found that CSX did not have standing to object to the special master's report disposing of the residual money in the settlement fund, because upon payment of the $16 million settlement, CSX was dismissed with prejudice from the case and was no longer a party to the action. The trial court found that CSX lacked the requisite personal stake in the outcome of the action.

" 'Whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy is what has traditionally been referred to as the question of standing to sue. Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends on whether the party has alleged * * * a "personal stake in the outcome of the controversy" [citation omitted] * * *.' " *Middletown v. Ferguson* (1986), 25 Ohio St.3d 71, 75, 25 OBR 125, 129, 495 N.E.2d 380, 384, quoting *Sierra Club v. Morton* (1972), 405 U.S. 727, 731–732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636, 641; *Cleveland v. Shaker Hts.* (1987), 30 Ohio St.3d 49, 51, 30 OBR 156, 158, 507 N.E.2d 323, 325.

CSX must allege and demonstrate a personal stake in the outcome of the controversy. The record shows that CSX no longer had a legally cognizable stake in the action once the trial court issued its May 1991 order dismissing the action and all claims against CSX with prejudice. In April 1993, the trial court found that CSX had no legal or equitable right to the remaining balance of the settlement fund.

The trial court retained jurisdiction over the parties and the settlement agreement. CSX yielded to the trial court the power to distribute the funds appropriately. In view of the record, we conclude that the trial court did not err when it found that CSX lacked standing to object to the special master's report and recommendation regarding disbursement of the balance of the settlement fund.

■ Although the trial court found that CSX lacked standing to object to the April 1993 order of the court and special master regarding the remaining balance in the settlement fund, the trial court addressed the objections of CSX and its underwriters to the court order. Thus, had the trial court committed error in finding that CSX lacked standing to object, the error would have been harmless in view of the fact that the trial court fully addressed CSX's objections to the order. CSX has not demonstrated prejudice other than the final outcome in the case, and this court has addressed the appropriateness of that result in Parts II and III of this opinion.

CSX's third assignment of error is overruled.

## V

The plaintiffs assert that this appeal is frivolous, and have asked for sanctions pursuant to App.R. 23. We conclude that this appeal is not frivolous. Accordingly, the plaintiffs-appellees request for sanctions is denied.

## VI

All of CSX's assignments of error having been overruled, the judgment of the trial court is affirmed.

*Judgment affirmed.*

BROGAN and WOLFF, JJ., concur.