## In re MIAMISBURG TRAIN DERAILMENT LITIGATION.

[Cite as *In re Miamisburg Train Derailment Litigation* (1999), 132 Ohio App.3d 571.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 16925.

Decided March 31, 1999.

572

*Stanley M. Chesley* and *Terrence L. Goodman;* and *James D. Ruppert,* for appellants.

*W. Roger Fry* and *Jonathan P. Saxton,* for appellees Albright & Wilson and ERCO.

*Gordon D. Arnold; William V. Johnson, William A. Geiser* and *Mindy L. Kallus,* for appellee Union Tank Car Company.

BROGAN, Judge.

In this case, the appellants, who are plaintiffs in a class action, seek reversal of a decision granting summary judgment in favor of appellees, Union Tank Car ("UTC") and the related corporations Albright & Wilson and ERCO (hereinafter, collectively, "A&W"). The trial court found that the claims of the plaintiff class were fully satisfied by the proceeds of an earlier settlement agreement with co-defendant, CSX Transportation Corp. ("CSX"), who has been released from the lawsuit. Because all claims, including those for punitive damages, were fully paid, the court reasoned, the class could not recover further compensatory or punitive damages from the remaining defendants.

We agree with the trial court that the class members already received full compensation for all claims because the factual finding underlying that determination came within a master's report adopted by the trial court without written objection from the plaintiff class. Under the Civil Rules, appellants cannot assign error in that finding. Nevertheless, we reverse the trial court's judgment because, under *Fidelholtz v. Peller* (1998), 81 Ohio St.3d 197, 690 N.E.2d 502, syllabus, the plaintiff class was not limited to a single satisfaction absent some legal determination that CSX was "liable in tort" under Ohio's Contribution Among Tortfeasors Act, R.C. 2307.31 *et seq.* Accordingly, we remand the cause for a determination of that question and other proceedings consistent with this opinion. We further remand the cause for the trial court to consider UTC's contractual claim for indemnity against A&W, which claim the trial court had improperly found moot.

## I

With this appeal, this case has now reached our appellate court for the third time in the case's thirteen-year history. The full facts of the case have been set out several times in our earlier opinions. See *In re Miamisburg Train Derailment Litigation* (Apr. 30, 1992), Montgomery App. No 12590, unreported, at 1, 1992 WL 87447, reversed (1994), 68 Ohio St.3d 255, 626 N.E.2d 85, certiorari denied *sub nom. Union Tank Car Co. v. Various Plaintiffs* (1994), 513 U.S. 809,

115 S.Ct. 59, 130 L.Ed.2d 17 (hereinafter *"Miamisburg Train Derailment I"*); *In re Miamisburg Train Derailment Litigation* (1993), 92 Ohio App.3d 304, 307–308, 635 N.E.2d 46, 47–49 (hereinafter *"Miamisburg Train Derailment II"*). We refer to those cases for a full recitation of the factual history behind this appeal. Nevertheless, for the sake of analytical clarity, we will review some of that factual history in brief.

On July 8, 1986, a train operated by CSX derailed in Miamisburg, Ohio. One of the cars that was wrecked in the derailment was a tank car carrying yellow phosphorus. The car was manufactured and owned by UTC and leased to A&W. The car ruptured and spilled its contents, which then ignited when exposed to the air, creating a cloud of phosphorous smoke. Because of potential dangers from the cloud's toxicity, local authorities effected mass evacuations of the surrounding area.

Several lawsuits were initiated against CSX and the appellees on account of this incident. The actions were subsequently joined and certified as a class action. Trial commenced on October 1, 1990. During trial, CSX settled all claims against it for $16 million. Trial then proceeded against UTC and A&W.

The plaintiffs' claims against UTC and A&W rested on their position that the tank car should have been equipped with a reinforcing brake pad that would have prevented the tank from breaching. In 1971, federal regulations were adopted requiring new tank cars to have these reinforcing pads. However, a separate regulation explicitly exempted tank cars manufactured before 1971 from this requirement. The defendants argued below that the federal regulations preempted any negligence claims based on the absence of the pads. The trial court denied the defendants' summary judgment motions but later granted directed verdicts based, in part, on the defendants' compliance with federal regulations. This court affirmed the trial court's judgment on preemption grounds, but the Supreme Court reversed that decision and remanded the case directly to the common pleas court for a new trial. *Miamisburg Train Derailment I,* 68 Ohio St.3d at 267–268, 626 N.E.2d at 94–96.

Meanwhile, the trial court appointed a special master to preside over the distribution of the settlement proceeds from CSX. On February 22, 1991, the court approved a plan for the allocation and distribution of the fund. Claim forms were prepared and distributed to claimants. Notice was given to potential class members through regular mail and by newspaper announcement, and the availability of the fund was reported on local television stations. Although the size of the class was originally estimated at in excess of 40,000 injured persons, only approximately 8,000 individuals filed claims. After all these claims were paid, a surplus remained in the fund of approximately $10.5 million.

The Special Master decided that the remainder of the fund should be distributed pro rata to members of the class claiming "non-economic" damages, meaning those with losses not limited to lost wages or revenues. He concluded that, although the amounts awarded for minor personal injury, emotional distress, and evacuation costs were "fair compensation," they were not full compensation. The master had adopted a conservative distribution policy for these members so that funds would be available for all claims, although it later happened that the number and amount of the claims filed was much less than had been anticipated. Consequently, the master decided upon a second distribution to these class members, and the trial court adopted the master's report.

CSX objected to this second distribution, claiming that the unpaid funds should be returned to it, arguing that it had a superior equitable interest in the remaining proceeds. After the trial court overruled its objections, the corporation appealed the decision authorizing the second distribution. This court affirmed the judgment of the trial court, holding that the plaintiff class had superior legal and equitable interests in the fund. *Miamisburg Train Derailment II*, 92 Ohio App.3d at 309–310, 635 N.E.2d at 49–50.

Only three personal-injury claimants, who had each received over $30,000 from the settlement fund in the first distribution, were excluded from the second distribution, as were those individuals claiming only "economic" losses. After all the claimants were paid a second time, the court adopted an order approving a final accounting of the settlement fund. $11,316,945 was distributed to the class members, $5,628,718 was distributed as legal fees to class counsel, and $38,870 went to two local charities. The trial court noted that this last amount given to charity was a remainder that was too small to distribute practically to the class members. In the order approving the final distribution, the Special Master entered the following finding of fact:

"The Master finds that this total compensation payment to the members of the class constitutes full and complete compensation for claims for any type of damages, including but not limited to injuries to person or property suffered by individual persons or entities as a result of the July 8, 1986 Miamisburg train derailment."

The trial court duly adopted the order including this finding without objection from any party.

With the plaintiff class's claim against UTC and A&W on remand from the Supreme Court, the remaining defendants moved the trial court for summary judgment. They argued that they could not be held liable in light of the court's earlier factual finding that the plaintiff class had been fully compensated for all its claims. The trial court accepted this argument, holding that all claims were fully satisfied by the settlement fund and that the plaintiffs were entitled only to

a single satisfaction of their claims. Accordingly, the court granted summary judgment in favor of both UTC and A&W. The plaintiff class now appeals from that judgment.

The class appellants raise two assignments of error on appeal, which are as follows:

"1. The trial court improperly ruled that the appellee-defendants were entitled to summary judgment by finding, as a matter of law, that members of the class had been fully and completely compensated where the record established that questions of fact exist.

"2. The trial court improperly ruled that the defendant-appellees were entitled to summary judgment by finding, as a matter of law, that plaintiff-appellant class had received full compensatory damages where questions of fact exist regarding the amount of damages individual class members sustained."

Because essentially the same arguments support both assignments of error, we will consider them both in tandem.

## II

### A

Appellants argue that the trial court erred by giving too much force to its prior finding that all claims were fully compensated from the settlement fund. They assert that the master's finding of full compensation should have been limited to claims against CSX and did not include any claims against the defendants who had not settled. The amount of total compensation due to the class was a question for the jury, they claim. They further assert that the settlement with CSX could not have extinguished any claims for punitive damages that the class had against the appellees.

Appellees counter, however, that the class is barred from assigning error in the finding of complete compensation because it failed to file any objections to the master's order including the finding. That order explicitly warned the parties about their duty to make a timely objection. The full paragraph containing the relevant finding reads as follows:

"The total compensation from the settlement fund (after payment of attorney's fees and administrative expenses) is $11.324.837. The Master finds that this total compensation payment to the members of the class constitutes full and complete compensation for claims for any type of damages, including but not limited to injuries to person or property suffered by individual persons or entities as a result of the July 8, 1986 Miamisburg train derailment. This report and recommendation by the Master finding full and complete compensation has been

received by the class is adopted as a permanent order of this Court. That part of this order finding full and complete compensation to the class shall be stayed upon the filing of objections by any party within fourteen days of the filing of this order. This permanent order is adopted pursuant to Ohio R.Civ.P. 53(E)(7)."

In its later order granting summary judgment, the trial court specifically noted the appellants' failure to object to the master's order and their failure to appeal from the final order approving the distribution and accounting of the settlement fund.

In the above-cited paragraph, the trial court noted that it was adopting the master's findings under Civ.R. 53(E). As the 1970 Staff Notes to Civ.R. 53 indicate, a special master is a "referee" within the meaning of that rule. Civ.R. 53(E)(6), as in effect in 1994 when the order was adopted, specifically barred a party from assigning as error on appeal the adoption of any referee's factual finding to which it did not make a timely objection. That rule stated:

"On appeal, a party may not assign as error the court's adoption of a referee's finding of fact unless an objection to that finding is contained in that party's written objections to the referee's report. The court may adopt any finding of fact in the referee's report without further consideration unless the party who objects to that finding supports that objection with a copy of all relevant portions of the transcript from the referee's hearing or an affidavit about evidence submitted to the referee if no transcript is available."

■ Under Civ.R. 53(E)(2), appellants had fourteen days from the filing of the master's order to object to this or any other factual finding. Having failed to do so, the plaintiffs waived any objection to the factual finding that they might now wish to raise on appeal.

■ Nonetheless, appellants argue that the finding of full compensation was never intended to apply to any recovery that they might receive from UTC and A&W. That position is belied, however, by the fact that UTC specifically requested that the master make such a finding in light of the smaller-than-anticipated claims against the settlement fund. The court's explicit warning in the same paragraph, that the finding would be adopted as a permanent order, shows that the court anticipated the finding's effect on the plaintiff class's ability to pursue further claims against the non-settling defendants.

■ Appellants also argue that the finding of full compensation did not apply to any punitive damages that they might recover from UTC or A&W. The master's finding, however, explicitly states that all "claims for any type of damages" were satisfied by the fund. The plain language of that finding encompasses claims for punitive damages. Moreover, one of the reasons that the trial court approved a second distribution of proceeds to the plaintiffs was

because their claims for punitive damages were prevented from going to the jury by the settlement. *Miamisburg Train Derailment II,* 92 Ohio App.3d at 312, 635 N.E.2d at 51. On appeal, this court employed the same reasoning in our determination that the plaintiffs had an equitable interest superior to that of CSX in any windfall created by the excess in settlement proceeds. *Id.* at 314, 635 N.E.2d at 52–53. Thus, we agree with the trial court that the finding of full compensation reached claims for both punitive and compensatory damages.

For the foregoing reasons, we find that the master's uncontested factual finding conclusively established that the class members received full compensation for all their claims.

### B

Furthermore, even if we were to find that the prior finding of full compensation had no authority, we would still affirm the trial court's determination on summary judgment motion that all class claims were fully satisfied by the proceeds from the settlement. Appellants bear the burden of proving their damages at trial. To show that they were not fully compensated by the CSX settlement fund, appellants would have to show damages in excess of the $11,316,945 that they received. Given the record in which class members already recovered far more from the settlement than was originally disbursed as "fair compensation," we think it impossible that appellants could prove such an excess of damages at trial.

In summary judgment, the moving party "bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims." *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 274. Once that party has met its burden, the nonmoving party has a reciprocal burden of showing that a genuine issue of material fact does exist. *Id.* at 294, 662 N.E.2d at 274–275. The nonmoving party is not permitted to rely on mere allegations or denials in his pleadings, but must point to some evidence in the record. See Civ.R. 56(E).

On the question of prior compensation, appellants have failed to meet their burden on summary judgment because they have not pointed to anything that might indicate that their damages exceeded the $11.3 million that they have already received. See *Kingsmen Ent., Inc. v. Kasunic* (July 23, 1998), Cuyahoga App. No. 72259, unreported, at 3, 1998 WL 413766 (holding that plaintiffs could not avoid summary judgment where they failed to show evidence of additional damages after a full compensation). At the very least, we find that no reasonable person could conclude that the class had received less than its full share of compensatory damages from the settlement. Because the defendants are enti-

tled to summary judgment on the question of punitive damages on other grounds, as we hold elsewhere in this opinion, this determination is sufficient to support the trial court's finding of full compensation for any claims that might remain against the appellees.

Appellants argue, however, that class members who had not previously asserted claims could do so against any class fund created by a judgment against the appellees. Thus, they claim, a material issue of fact exists as to whether any new claims might arise in excess of the amount already disbursed. We disagree. All members of the class were given the opportunity to make their claims and given a deadline within which to file them. That aspect of the case has been fully adjudicated, and no appeal was taken from the order approving the final accounting. Under Civ.R. 23, all members were notified that they would be bound by the trial court's judgment unless they requested exclusion. We conclude that any class members who failed to make timely claims seven years ago would be barred from doing so today.

For the foregoing reasons, we hold that the trial court did not err in finding that the appellants were fully compensated for all their claims from the 1986 train derailment.

### III

### A

Having concluded that all class members received full compensation for their claims, the trial court then found that any claims that the class had against UTC and A&W were barred by the "one satisfaction" rule of *Seifert v. Burroughs* (1988), 38 Ohio St.3d 108, 110, 526 N.E.2d 813, 814–815. In that case, the Supreme Court announced:

"The law of Ohio is well-settled that an injured party is entitled to only one satisfaction for his injuries, 'and that receipt of full compensation from one of several persons whose concurrent acts of negligence are the basis of a suit for damages for personal injuries releases all.' [38 Ohio St.3d at 110, 526 N.E.2d at 814] (Emphasis added.) *Royal Indemnity Co. v. Becker* (1930), 122 Ohio St. 582, 589, 173 N.E. 194, 196; see, also, *id.* at paragraph one of the syllabus.

"More particularly, we have held that 'in an action to recover damages * * * claimed to have been caused by * * * two defendants [where] the amount of damages sustained is determined by the jury * * *, the payment of such amount and receipt thereof by the plaintiff, releases both defendants.' (Emphasis added.) *Cleveland Ry. Co. v. Nickel* (1929), 120 Ohio St. 133, 165 N.E. 719, at paragraph two of the syllabus. The same rule applies to the tender and

acceptance of a compromise amount, which is followed by the trial court's journal entry that the judgment is satisfied. *Gholson v. Savin* (1941), 137 Ohio St. 551, 19 O.O. 309, 31 N.E.2d 858, 139 A.L.R. 75." *Id.*

As the *Seifert* opinion recognized, under the common law, when the amount of damages that a party suffered has been finally adjudicated, that party is precluded from relitigating the question of damages. *Id.* Thus, after that amount is paid in full, the injured party no longer has any enforceable claim against any other person who is liable for the same injuries. See Restatement of the Law 2d, Judgments (1982) 43, Section 50, Comment *d.* The same result is reached under the rule that any consideration received by a claimant in payment of a tort obligation discharges the obligation of all other liable parties to the extent of the value received. See Restatement, *supra,* at 41, Section 50(2). Having received the entire amount of his damages, as finally adjudicated, the claimant can demand no more, even if other parties have not paid to the extent of their full responsibility. Both of these common-law rationales are based on the fundamental principle that an "injured party is entitled to be recompensed only once by persons chargeable with injuring him." Restatement, *supra,* at 44, Section 50, Comment *e.*

The trial court concluded that, because the appellants had already received full compensation from the settlement fund, they were not entitled to pursue additional compensation from the appellees. Under the common-law rule of "single satisfaction," we agree that this would have been the right result. Nevertheless, in light of the recent Ohio Supreme Court ruling in *Fidelholtz v. Peller* (1998), 81 Ohio St.3d 197, 690 N.E.2d 502, we are forced to conclude that the common-law rule has been partially abrogated in Ohio. Under *Fidelholtz,* the Supreme Court has now adopted a kind of "multiple satisfactions" rule for tort suits involving more than one defendant. That rule prevents us from affirming the trial court's grant of summary judgment. Neither party has cited *Fidelholtz* to us on appeal. Nevertheless, we are compelled to follow what we conclude is controlling precedent in this case.

*Fidelholtz* involved a medical malpractice tort suit against two pathologists who failed to properly diagnose a malignant growth on the plaintiff's leg. *Id.* at 198, 690 N.E.2d at 502–504. Because of the delay in detecting the plaintiff's cancer, doctors were forced to amputate her leg below the knee. *Id.* The patient and her husband sued both pathologists. One of the defendants settled before trial for $125,000. *Id.* at 199, 690 N.E.2d at 504. A jury then awarded the plaintiffs $250,001. *Id.* The trial court then reduced the award by the $125,000 that the plaintiff had already received as a settlement. The trial court relied on former R.C. 2307.32(F) (now R.C. 2307.33[F] ) and the precedent of *Ziegler v. Wendel Poultry Serv., Inc.* (1993), 67 Ohio St.3d 10, 615 N.E.2d 1022, which had held that

the amount received in settlement from one defendant should automatically be deducted from a jury award against another. *Fidelholtz,* 81 Ohio St.3d at 199, 690 N.E.2d at 504. When the case reached the Supreme Court, the court overruled the five-year-old precedent of *Ziegler* and reversed the trial court's decision to offset the award by the amount of the settlement. *Id.* at 203, 690 N.E.2d at 506–507. Doing so, the court engaged in an unconventional interpretation of former R.C. 2307.32(F), which is now R.C. 2307.33(F). *Id.* at 202–203, 690 N.E.2d at 506–507.

That statute represents the state legislature's adoption of Section 4(a) of the Uniform Contribution Among Tortfeasors Act (1955). See *Beck v. Cianchetti* (1982), 1 Ohio St.3d 231, 234, 1 OBR 253, 256, 439 N.E.2d 417, 419, fn. 3. The majority view among states having adopted the Uniform Act is that settlements are automatically offset from a final award, thus limiting the plaintiff to a single recovery. See *Fidelholtz,* 81 Ohio St.3d at 200–201, 690 N.E.2d at 504–506 (rejecting the majority approach); see, also, 18 American Jurisprudence 2d (1985) 74–75, Contribution, Section 68 ("[A] release or covenant not to sue or not to enforce judgment will reduce the claim against the other tortfeasors to the extent stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is greater."). This is also the view taken by the American Law Institute in the Restatements. See Restatement of the Law 2d, Torts (1965) 333, Section 885(3); Restatement of the Law 2d, Judgments (1982) 41, 42, Section 50(2), Illustration 1.

With *Fidelholtz,* the Supreme Court linked Ohio with a handful of other states that do not automatically provide for a setoff after settlement. See 81 Ohio St.3d at 201, 690 N.E.2d at 505–506. Of those states, Delaware, Pennsylvania, and Maryland, none has adopted the 1955 version of the Uniform Act. See Weeks, The Unsettling Effect of Maine Law on Settlement in Cases Involving Multiple Tortfeasors (1996), 48 Me.L.Rev. 78, 94, fn. 100. Like those states, Ohio now requires a defendant to show that the settling tortfeasor was also liable to the plaintiff for the same injury before he may set off a judgment by the amount of a prior settlement under R.C. 2307.33(F). 81 Ohio St.3d at 201, 203, 690 N.E.2d at 505–506, 506–507. If, however, the defendant can show that his former co-defendant was liable for even one percent of the plaintiff's damages, he is entitled to a setoff of the full amount. See *Med. Ctr. of Delaware, Inc. v. Mullins* (Del.1994), 637 A.2d 6, 10, cited in *Fidelholtz,* 81 Ohio St.3d at 201, 690 N.E.2d at 505–506. We conclude that the *Fidelholtz* rule partially abrogates the common-law "single satisfaction" rule because the former is the controlling authority for interpreting R.C. 2307.33(F). As the two rules are manifestly inconsistent, the statutory interpretation must prevail. See *In re McWilson's Estate* (1951), 155 Ohio St. 261, 267, 44 O.O. 262, 264–265, 98 N.E.2d 289, 292.

As a practical matter, under *Fidelholtz*, there is a presumption that non-settling defendants are solely responsible for the plaintiff's injuries and, therefore, not entitled to a setoff. See *id.* at syllabus; also compare *Fidelholtz* with *Thurston v. 3K Kamper Ko., Inc.* (Me.1984), 482 A.2d 837, 842 (adopting a similar conditional setoff rule but only where the defendant permits the jury to apportion liability between it and the settling former co-defendant in an effort to reduce its liability). As a consequence, each defendant must seek some legal determination that his former co-defendant was at least partially responsible for the tort damages. *Id.* Partial responsibility may be shown by a judicial adjudication, by stipulation, or through the language of the release itself. *Id.*

Generally, we think it unlikely that settlement agreements will prove to be a fruitful source for determinations of partial responsibility that would permit setoff under R.C. 2307.33(F). As the court noted in *Fidelholtz*, a settlement is not itself an admission of liability. *Id.* at 201, 690 N.E.2d at 505–506, citing *Chitlik v. Allstate Ins. Co.* (1973), 34 Ohio App.2d 193, 198, 63 O.O.2d 364, 367, 299 N.E.2d 295, 298–299. After *Fidelholtz*, neither party to such an agreement can have much interest in the settling defendant's making an admission of responsibility. Indeed the plaintiff—who in the past might have sought such an admission—now has a financial incentive to avoid the same.

In the instant case, the settlement agreement between CSX and the class representatives provides no help to the appellees. The relevant agreement in this case specifically stated, "By signing this Settlement [Agreement] and paying the amount agreed upon herein, the CSX defendants do not admit liability." *Miamisburg Train Derailment II*, 92 Ohio App.3d at 313, 635 N.E.2d at 52. Thus, the terms of the settlement do not prevent the class from seeking another full compensation from the remaining defendants.

The appellees are left, therefore, to seek a determination of CSX's responsibility through judgment or stipulation. Although the master's report found that the plaintiff class had received full compensation for all its injuries, it did not find that CSX was, in fact, responsible for those injuries. Nor are we aware of any stipulation in the record regarding CSX's share of liability. As a consequence, we must sustain the appellants' assignments of error and reverse the trial court's decision granting summary judgment. This cause must be remanded for some determination regarding CSX's liability and for the class to proceed with its claims against the appellees if the appellees are found solely responsible. If, however, on remand the appellees are able to obtain a favorable determination of CSX's partial liability, they should be permitted to offset the whole amount of the settlement and, thereby, avoid any liability for damages.

B

Because the paths by which a settling party's fault may be determined are uncharted in Ohio, we believe the trial court is due some guidance on the question. Case law from other states that have adopted rules similar to *Fidelholtz* may prove helpful. The parallel with these other states is not always perfect, however.

In Delaware, it appears that one defendant, through a cross-claim, can prevent another defendant from escaping the burden of litigating a case via settlement. See *Med. Ctr. of Delaware,* 637 A.2d at 7. This ability appears to derive from a defendant's right, in that state, to reduce his liability pro rata according to his co-defendant's proportional share after a jury apportions liability. Ohio does not permit this type of reduction, however. See *Bowling v. Heil Co.* (1987), 31 Ohio St.3d 277, 287, 31 OBR 559, 567–568, 511 N.E.2d 373, 381. It appears fairly clear, moreover, that in Ohio, under R.C. 2307.33(F)(2), a defendant should escape from a lawsuit altogether as long as he settles with the plaintiff in good faith.

R.C. 2307.33(F)(2) provides that a "release or covenant discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor." Although the *Fidelholtz* definition of "tortfeasor" under the Uniform Act presents some difficulties here, nonetheless, we conclude that one defendant cannot prevent another from escaping the lawsuit under this section by maintaining a cross-claim. In *Fidelholtz,* the court held that a party becomes a "tortfeasor" only after there has been some legal determination of his partial responsibility. 81 Ohio St.3d 197, 690 N.E.2d 502, at syllabus. Read in that way, the statutory right to evade a cross-claim will not arise often until after a jury verdict is entered. Even if a settling defendant were determined not to be a "tortfeasor," however, he would still owe nothing to his co-defendants because only tortfeasors are liable for contribution. We cannot see any sense in requiring a party to litigate a case in which that party has no remaining interest. The only reasonable interpretation of R.C. 2307.33(F)(2) is that it permits a defendant to escape the burden of further litigation after settlement. Thus, we do not think that the Delaware approach of forcing multiple defendants to litigate proportional share after settlement is appropriate in Ohio.

It appears that the more promising route is for non-settling defendants to request that a special interrogatory be submitted to the jury asking if the settling party was responsible for any fraction of the plaintiff's damages. See, *e.g., Asbestos Litigation v. Owens–Corning* (Del.Super.1995), 669 A.2d 108, 113 ("The jury should have been asked if one or more of the settling defendants was negligent and, if yes, was that negligence also a proximate cause of each decedent's lung cancer."). This approach does leave the non-settling defendant in the difficult position of proving the partial liability of a non-party at trial. If one

defendant settles early, this may deprive the remaining defendants of traditional discovery mechanisms that would have been available against a party. There also are a number of procedural and evidentiary questions that must arise in trying this question before a jury. See, *e.g., Thurston*, 482 A.2d at 841 (holding settlement agreement was not admissible as evidence to show liability); *Korn v. Consolidated Rail Corp.* (1986), 355 Pa.Super. 170, 512 A.2d 1266, 1269 (requiring jury to apportion damages among all settling and non-settling tortfeasors and assessing prejudgment interest only for non-settling defendant's proportional share of the whole verdict). These issues are too many and complex for us to adequately address them today. The precise contours of post-*Fidelholtz* procedure involve questions that courts may have to consider for some time to come.

 Although the partial liability of non-party tortfeasors will generally be a question of fact for a jury, partial summary judgment on this question could still be granted in certain cases. If, as a logical matter, a non-settling defendant could not be held liable without the settling defendants also being held liable, a court could grant summary judgment on this question, thereby entitling defendant to the statutory setoff. We reach no conclusion regarding whether summary judgment might be appropriate on this ground in the instant case. On this question, appellees have not met their initial burden of "informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims." *Dresher*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 274.

 In *Fidelholtz*, the court noted that a stipulation may also determine the settling defendant's liability for the purposes of R.C. 2307.33(F). In this regard, we see no reason why a non-settling defendant could not make a request for admission under Civ.R. 36, requiring the plaintiff to admit that the settling defendant was partially responsible for his damages. That rule provides, in part:

"A party may serve upon any other party a written request for the admission, for purposes of the pending action only, of the truth of any matters within the scope of Rule 26(B) set forth in the request that relate to statements or opinions of fact or of the application of law to fact, including the genuineness of any documents described in the request. Copies of documents shall be served with the request unless they have been or are otherwise furnished or made available for inspection and copying. The request may, without leave of court, be served upon the plaintiff after commencement of the action and upon any other party with or after service of the summons and complaint upon that party."

An admission under Civ.R. 36 is in the nature of a stipulation and may determine a particular question for the purposes of a pending action but not in any matters beyond that action. See 1970 Staff Note to Civ.R. 36.

 If the non-settling defendant makes such a request, it appears to us that the plaintiff, in most cases, would have to oblige. As with its counterpart in the Federal Rules of Civil Procedure, the purpose of Civ.R. 36 in Ohio is "to compel admission of matters which ought to be admitted in the interest of expedition, so that all issues as to which there can be no controversy in good faith, may be eliminated." *Demmert v. Demmert* (1953), 115 F.Supp. 430, 14 Alaska 425, 430. Between a non-settling defendant and a plaintiff, there is rarely any real dispute over the liability of any settling defendant, and the availability of multiple recoveries after *Fidelholtz* should not create a dispute, in our view. If the plaintiff has asserted in his complaint that the settling defendant is liable, he should be prevented, in good faith, from denying the same in a response to a request for admission. Moreover, the rule would not permit the plaintiff to simply claim a lack of knowledge. As the rule states:

"An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless he states that he has made reasonable inquiry and that the information known or readily obtainable by him is insufficient to enable him to admit or deny. A party who considers that a matter of which an admission has been requested presents a genuine issue for trial may not, on that ground alone, object to the request."

Thus, having once claimed that the settling defendant was a tortfeasor and received compensation in a good-faith settlement of that claim, the plaintiff should not be permitted to give an indefinite answer to the request by maintaining that the question has yet to be determined by a jury.

Furthermore, there is something fundamentally unseemly about a party's taking money from a settling defendant after forcing him into court and then, afterwards, claiming that the defendant was not responsible for even one *per cent* of the party's injuries. See *Fidelholtz*, 81 Ohio St.3d at 207, 690 N.E.2d at 509 (Lundberg Stratton, J., dissenting) ("It is unethical and immoral for a plaintiff to take money from a defendant who the plaintiff no longer believes is liable."). As a matter of equity, a plaintiff should be estopped from switching sides on this question after settlement. If a plaintiff cannot maintain in good faith that the settling defendant was not liable, then no real dispute on this question exists between the remaining parties. Because Civ.R. 36 was intended to resolve matters that are not in dispute, it appears to us an appropriate mechanism for seeking the necessary legal determination of the settling defendant's "tortfeasor" status under *Fidelholtz*. In the instant case, if appellees obtain an admission

from the class under Civ.R. 36 that CSX was liable, that admission may provide grounds for a new summary judgment motion.

After this cause is remanded to the trial court, appellees will bear the burden of seeking a legal determination of CSX's liability through the methods outlined above or some other means. As we have noted, if the appellees are able to obtain a favorable determination on this question, they should be entitled to judgment as a matter of law for the same reasons announced in the judgment that we reverse today.

## IV

### A

Appellees urge us to affirm the grant of summary judgment even if we find error—as we have—in the trial court's determination that the plaintiff class received full satisfaction and was, therefore, barred from further litigation. Appellees argue that the class failed to present evidence showing that appellees breached any legal duty in not fitting their tank car with reinforcing brake pads. They also argue that the plaintiffs failed to show that they were liable for any punitive damages.

Appellants respond by arguing that both questions must be submitted to a jury because of the nature of the remand from the Supreme Court to the trial court. Although the trial court had granted directed verdicts in favor of appellees for insufficient evidence of either negligence or conduct warranting punitive damages, this court affirmed the judgment solely on the grounds of federal preemption. See *Miamisburg Train Derailment I*, 68 Ohio St.3d at 256, 626 N.E.2d at 87. After reversing our decision, the Supreme Court chose not to remand the cause to this court for further consideration of the directed verdicts but instead remanded it to the trial court for a new trial. *Id.* at 268, 626 N.E.2d at 95–96. The court noted:

"Our holding in this case is limited to a determination that appellants' claims are not preempted. We remand the cause to the trial court for a new trial, rather than remanding to the court of appeals for consideration of the propriety of the trial court's directed verdict, because in our view the concept of federal preemption played too great a role in the trial court's decision to direct a verdict in favor of appellees. Of course, we make no comment regarding the merits of appellants' claims." *Id.* at 268, 626 N.E.2d at 95, fn. 7.

Appellants argue that this part of the Supreme Court opinion mandates that all issues regarding negligence and punitive damages be tried to a jury because the nature of the remand presumed that appellees were not entitled to judgment as a matter of law on any claims. Appellees counter that the fact that the Supreme

Court did not address the merits of appellants' claims leaves open the possibility that summary judgment could be granted on any grounds other than federal preemption.

It is clear to us that, after the Supreme Court's decision, questions of fact exist regarding appellees' negligence that belong to a jury. The court stated that "appellees' compliance with a nonspecific regulation * * * does not preempt appellants' claims *and also does not conclusively insulate UTC from liability.*" (Emphasis added.) *Id.* at 267, 626 N.E.2d at 95. Thus putting aside the question of appellees' compliance with federal regulations, it appears to us that sufficient evidence remains to support a finding of negligence. Appellants presented the testimony of a number of expert witnesses who expressed opinions regarding the unsafeness of the tank car design without reinforcing brake pads. There was sufficient evidence in the record also for a jury to find that the absence of reinforcing pads was the proximate cause of the tank car's rupture and the ensuing toxic spill. Accordingly, we reject appellees' argument as alternative grounds for affirming the judgment below.

### B

Nevertheless, we agree with appellees that they are entitled to partial summary judgment on the question of punitive damages. We do not believe that the Supreme Court's opinion, which never touched on the subject of punitive damages, was intended to prevent appellees from seeking judgment as a matter of law on any issue or on any grounds.

In Ohio, punitive damages are awarded only upon a showing of fraud, malice, or insult. *Preston v. Murty* (1987), 32 Ohio St.3d 334, 334, 512 N.E.2d 1174, 1174–1175, citing *Roberts v. Mason* (1859), 10 Ohio St. 277, 1859 WL 78, paragraph one of the syllabus. There is no suggestion of fraud or insult in this case. Thus, the question of punitive damages turns on the existence of actual malice, which is usually the key to recovering punitive damages under Ohio law. See *Ferritto v. Olde & Co., Inc.* (1989), 62 Ohio App.3d 582, 588, 577 N.E.2d 101, 105–106. The controlling standard for determining when a defendant's actions can be characterized by malice was announced by the Supreme Court in *Preston v. Murty:*

"Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. In the latter case, before submitting the issue of punitive damages to the jury, a trial court must review the evidence to determine if reasonable minds can differ as to whether the

party was aware his or her act had a great probability of causing substantial harm. Furthermore, the court must determine that sufficient evidence is presented revealing that the party consciously disregarded the injured party's rights or safety." 32 Ohio St.3d at 336, 512 N.E.2d at 1176.

Absolutely nothing in the record before us suggests that appellees were motivated by a spirit of hatred, ill-will, or revenge. We are concerned, then, only with whether they acted with "conscious disregard for the rights and safety of others." As the Supreme Court instructed in *Preston*, this is a question that should be carefully reviewed before submitting it to a jury to see if judgment ought to be granted to the defendants as a matter of law. See *id.*

Ultimately, we see no factual questions in this case that would warrant submitting the issue of punitive damages to a jury. Even if appellees' compliance with a non-specific federal regulation had no preemptive effect on the class claims against them, the evidence of compliance does show that appellees were acting according to industry standards, which did not require operators to retrofit early tank cars with reinforcing pads. That fact alone may not protect them against a claim of negligence. See *The T.J. Hooper* (C.A.2, 1932), 60 F.2d 737, 740 ("[I]n most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It may never set its own tests, however persuasive be its usages."). It does, however, overwhelm any suggestion that appellees acted with conscious disregard for safety. As the *Preston* court noted, "A second principle inherent in the award of punitive damages is that something more than mere negligence is always required. This concept is reflected in the use of such terms as 'outrageous,' 'flagrant,' and 'criminal.'" (Citations omitted.) 32 Ohio St.3d at 335–336, 512 N.E.2d at 1176. No reasonable person could reconcile the appellees' compliance with the regulation in question with the notion that their behavior was somehow "outrageous," "flagrant," or "criminal."

The testimony presented at trial also failed to show that any negligence of the appellees presented a "great probability of causing substantial harm." In light of the events underlying this case, we know that any breach in the tank containing phosphorous presented some danger of substantial harm, given the widespread effects of the phosphorous cloud. Nevertheless, appellants failed to show that the absence of reinforcing pads itself created a great probability of that harm occurring. Appellants' experts were able to testify that use of the pads would have reduced the likelihood of a breach. They were unable to testify, however, that the absence of pads greatly increased that likelihood. The tank car might have breached even if it had been retrofitted with those pads. When asked, for example, what number of eight tank car breaches that had occurred

over a period of years could have been prevented by the use of reinforcing pads, plaintiff's metallurgical engineering expert responded:

"A. I have no idea. That is what I have stated to you before. It is difficult. You can't make a definitive statement on probabilities. But, if you are interested in safety and you want to do the best you can, you use the pad."

This kind of testimony regarding the desirability of reinforcing pads was enough to create an issue of fact regarding appellees' negligence. Nonetheless, without some evidence showing that appellees' negligence created a "great probability of substantial harm," appellants' case was insufficient to support a finding of malice. Thus, appellees were entitled to partial summary judgment on the class appellants' punitive-damage claims.

Accordingly, we affirm the judgment of the trial court in part, to the extent that it granted judgment in appellees' favor on the question of punitive damages.

### V

Finally, appellee UTC raises one cross-assignment of error on appeal. Therein, UTC asserts:

"The trial court erroneously concluded that Union Tank's counterclaim for indemnity was rendered moot by the entry of summary judgment for the defendants."

When UTC leased its tank car to A&W, the parties signed an agreement containing two indemnification clauses. As part of the agreement, A&W agreed to indemnify UTC against certain claims. Section 4.02 of the agreement stated:

"Lessor shall not be liable for any loss or damage to any commodity loaded or shipped in any car, regardless of how such loss or damage may be caused. Lessee shall indemnify Lessor against and hold Lessor harmless from all claims, liabilities, losses, damages, costs and expenses (including reasonable attorneys' fees) arising out of or resulting from the loss of or damage to any such commodity or the loading, unloading, spillage, leakage, emission or discharge of commodity in or from the car, including without limitation any liability for injury, death, property damage or environmental pollution."

Section 4.05 stated:

"Indemnification. Lessee shall defend (if such defense is tendered to Lessee), indemnify and hold Lessor harmless from and against all claims, liabilities, losses, damages, costs and expenses (i) for which one or more railroads had assumed full responsibility or (ii) which result solely from the active negligence or wilful misconduct of Lessor."

A choice-of-law clause elsewhere in the agreement indicated that it would be governed by the laws of Illinois.

After granting summary judgment in favor of both appellees, the trial court held that UTC's claim for indemnity against A&W was rendered moot. Certainly, that was true in regard to the plaintiff class's claims for damages against UTC. However, because we have revived the class's claims against both UTC and A&W with our decision today, the claim for indemnity can no longer be called moot.

Furthermore, even if the class's claims against UTC had been properly extinguished, UTC would still have an action for indemnity. Section 4.05 of the agreement plainly contemplates that A&W will indemnify UTC not only for all claims arising from a spill, but also for the consequent costs, expenses, and reasonable attorney fees. Such an indemnity agreement is enforceable under Illinois law. See, *e.g.*, *Nogacz v. Procter & Gamble Mfg. Co.* (1976), 37 Ill.App.3d 636, 647, 650, 347 N.E.2d 112; see, also, 21 Illinois Law & Practice 470–471 (1977), Indemnity, Section 16. Thus, UTC's claim for indemnity against A&W would not be mooted by a resolution of the class's claims in its favor.

Accordingly, we sustain appellee UTC's cross-assignment of error and reverse the trial court's judgment on UTC's claim for indemnity. The trial court, however, has not had the opportunity to otherwise consider the merits of UTC's claim, and the parties have not argued the merits on appeal. Therefore, we will remand the cause for the trial court to fully consider UTC's claim.

## VI

In light of the foregoing, we reverse, in part, the decision of the trial court granting summary judgment in favor of the appellees. We remand the cause for the trial for further proceedings consistent with this opinion. The trial court may then consider, under *Fidelholtz v. Peller* (1998), 81 Ohio St.3d 197, 690 N.E.2d 502, syllabus, whether the settling defendant, CSX, was partially responsible for the class plaintiffs' injuries. Only if CSX was responsible would the appellees be permitted, under R.C. 2307.31, to set off a judgment against them by the full and complete compensation that the class received from CSX. We affirm the grant of summary judgment, in part, to the extent that it resolved all claims for punitive damages in favor of the appellees. We further reverse the trial court's judgment in favor of cross-appellee A&W on cross-appellant UTC's claim for indemnity. On remand, the trial court shall consider the merits of UTC's claim.

*Judgment accordingly.*

WOLFF and FAIN, JJ., concur.