OPINION
Petitioner-appellant, Dennis McGuire ("petitioner"), appeals the Preble County Common Pleas Court's ruling denying his second and successive petition for postconviction relief, which challenged his conviction of aggravated murder while committing rape and the imposition of the death penalty. We affirm the trial court's order denying the petition.
In December 1994, petitioner was convicted of the aggravated murder, rape, and kidnapping[1] of Joy Stewart. See State v. McGuire (Apr. 15, 1996), Preble App. No. CA95-01-001, unreported. The jury recommended that petitioner be sentenced to death. The trial court adopted the jury's recommendation, and petitioner was sentenced to death after a hearing. The facts as found in petitioner's direct appeal are as follows:
 Joy Stewart was last seen alive on February 11, 1989. That morning, she had breakfast with her neighbors between 9 and 10. She went there alone that morning because her husband, Kenny Stewart, a truck driver, worked that day from approximately 7:00 a.m. to 5:00 p.m. After breakfast, Joy went to visit Juanita Deaton, the mother of her friend Chris Deaton. Mrs. Deaton and her son lived next to each other in a duplex in West Alexandria.
 McGuire had been hired by Chris Deaton to clean the ice out of his gutters that day. According to Chris, McGuire started around 9 or 10 a.m., and finished around noon. Mrs. Deaton testified that Joy arrived at around 9:30 or 10:00, while McGuire was working.
 Mrs. Deaton saw Joy talking to two unidentified males in a dark-colored car before she left. As Joy was leaving, she told Mrs. Deaton that "she was going to catch a ride somewhere," although Mrs. Deaton did not actually see Joy leave in the car. Mrs. Deaton was unsure whether McGuire was one of the men in the car. A few minutes later, however, Mrs. Deaton asked whether McGuire had finished working on the gutters, and her son stated that McGuire had been paid and left.
 Jerry Richardson, McGuire's brother-in-law, testified that McGuire later came over to his house that afternoon. While they were in Richardson's garage, Joy came in and said she wanted some marijuana. Richardson further testified that McGuire offered to get her some, and the two left in McGuire's car.
 The following day, February 12, two hikers found the body of Joy Stewart in some woods near Bantas Creek. The front of her shirt was saturated with blood. One deputy sheriff at the scene, Larry Swihart, also noted that there appeared to be a "blood wipe mark" on her right arm. The body was taken to the Montgomery County Coroner's Office, where an autopsy was performed. The autopsy revealed that Joy had been stabbed twice. One wound, located above the left collarbone, caused no significant injury. The critical wound was a four-and-a-half-inch-deep cut in the throat, which completely severed the carotid artery and jugular vein. The doctor determined that Joy was alive when she received the wound, and that such a wound could have been caused by a single-edged blade shorter than four and a half inches, due to "how soft and moveable the tissues are in the neck." The autopsy also revealed abrasions around the neck, impressed with the cloth pattern of Joy's shirt.
 The coroner's office also took vaginal, oral, and anal swabs. The coroner found an abundant amount of sperm on the anal swab, some sperm on the vaginal swab, and none on the oral swab. The coroner indicated that sperm could be detected in the vagina for days or sometimes weeks after ejaculation; however, sperm in the rectum could be detected for a lesser time "because the environment is fairly hostile for sperm, and * * * a bowel movement * * * usually will purge the rectum of any sperm."
 Investigator David Lindloff of the Preble County Prosecutor's Office investigated the murder, but to no immediate avail. However, in December 1989, Lindloff was notified that McGuire wanted to talk to him about information concerning a murder in Preble County. McGuire was in jail at the time on an unrelated offense and told a corrections officer that he needed to talk to Investigator Lindloff and Deputy Swihart.
 Joseph Goodwin, the corrections officer McGuire initially talked to, took appellant to a private room to talk, where McGuire told him that he knew who had killed Joy Stewart. McGuire stated that Jerry Richardson, McGuire's brother-in-law, had killed Joy with a knife, and appellant could lead investigators to it. McGuire explained to Officer Goodwin that Richardson had wanted to have sex with Joy, but she had refused. McGuire claimed that Richardson then pulled a knife on her, and forced her to have oral sex with him. McGuire then said Richardson anally sodomized her because he "couldn't have regular sex with her because she was pregnant." He also said Richardson stabbed her "in the shoulder bone" and "cut her throat."
 Based on these details, Goodwin contacted Investigator Lindloff, who talked to McGuire on December 22, 1989. McGuire told Lindloff that Richardson committed the murder, that he stabbed Joy twice in the neck, and that "the first time it didn't go in. He pulled the knife back out and stuck her again." Lindloff was interested, since the fact that Joy had been stabbed twice in the neck and anally sodomized had not been revealed to the public at that time. The appellant also described in detail the area where Joy's body had been found.
 McGuire then led Lindloff and deputies to the murder weapon, on a local farm where he and Richardson had occasionally worked. McGuire led the officers to the hayloft and showed them where a knife was hidden behind a beam.
 A subsequent audiotaped interview by Deputy Swihart elicited further details from McGuire. McGuire claimed that Richardson choked Joy before stabbing her and wiped his bloody hands off on her, both of which actions were consistent with the state of Joy's body at the crime scene. Again, Swihart felt that these details were significant, since they had never become a matter of public knowledge. Furthermore, McGuire stated that he was pretty sure that Richardson was driving his mother's blue Ford Escort the day of the murder. However, Richardson's mother later testified at trial that she had traded that car in 1988, a year before the murder, and Richardson did not have access to her car on the day of the murder, since she had driven it to work.
 While in prison on December 24, 1989, McGuire received a visit from his childhood friend Shawn Baird. At the time, McGuire told Baird that he knew about a murder that happened in Preble County in February. When Baird asked who did it, the appellant stated that he and Jerry Richardson had done it, and he was going to blame it all on Jerry.
 A fellow inmate at the Preble County Jail, Jack Stapleton, testified that he had overheard a conversation between McGuire and another inmate, in which McGuire claimed that he had seen his brother-in-law rape and murder Joy. However, at one point, McGuire apparently slipped and implicated himself when telling the story. While describing the murder, Stapleton testified that McGuire "had his hand like this describing [sic], telling the guy how she was killed. And he said I — he goes I mean he. Stabbed her like this. Hit a bone. It didn't kill her. So he stabbed her again."
 McGuire was later transferred to Madison Correctional Institute. An inmate there, Willie Reeves, testified that McGuire told him that while he was cleaning gutters, Joy showed up asking whether McGuire had any marijuana. McGuire offered to share some with her, and they left in his car. At one point McGuire asked whether she wanted to have sex, and she refused. McGuire then told Reeves he did it anyway. He then explained that because she was so pregnant, it was difficult to engage in sex with her, so instead he anally sodomized her. Joy then became "hysterical," which made McGuire nervous. He ended up killing Joy for fear that he would go to jail for raping a pregnant woman.
 In June 1992, the Montgomery County Coroner's Office sent the vaginal, anal, and oral swabs collected from Joy's body, along with a cutting from her underpants, to Forensic Science Associates, a private laboratory, for DNA testing using the PCR technique. A forensic scientist there compared DNA extracted from the samples with blood samples taken from Dennis McGuire, Jerry Richardson, Joy Stewart, and Joy's husband, Kenny Stewart. The scientist determined that McGuire could not be eliminated as a source of the sperm. Kenny Stewart and Richardson, however, could be eliminated, unless there were two sperm sources, e.g., multiple assailants. This was because the sperm analyzed contained a DQ Alpha type 3, 4, with a trace amount of DQ Alpha type 1.1, 2. McGuire's DNA was the DQ Alpha type 3, 4, whereas Richardson, Stewart, and the victim's DNA was the DQ Alpha type 1.1, 2. The forensic scientist testified that the trace amount of 1.1, 2 could have resulted either from Joy's epithelial cells taken in the swab, or from a secondary sperm source. The sperm DNA analyzed had characteristics that appear in about one in one hundred nineteen males in the white population. On December 22, 1993, McGuire was indicted on one count of aggravated murder under R.C. 2903.01(B), with one felony-murder specification for rape under R.C. 2929.04(A)(7). McGuire was also indicted on two counts of rape (vaginal and anal) and one count of kidnapping.
 On December 8, 1994, the jury returned a guilty verdict on the aggravated murder and specification charge. McGuire was also convicted of anal rape and kidnapping. After a sentencing hearing, the jury recommended a sentence of death for the aggravated murder. The trial judge sentenced the appellant to death[.]
 State v. McGuire (1997), 80 Ohio St.3d 390, 391-394
(footnote omitted).
This court affirmed petitioner's conviction and death sentence on direct appeal. McGuire, Preble App. No. CA95-01-001, unreported. The Ohio Supreme Court affirmed this court's decision. McGuire,80 Ohio St.3d 390.
On October 21, 1996, petitioner filed his first petition for postconviction relief in the trial court, raising eighteen "causes of action." In "Cause of Action X," petitioner claimed that his attorneys were ineffective because they had failed to adequately investigate his background to find mitigating factors that could have been presented to the jury during the death penalty phase. The trial court denied the petition without a hearing on May 15, 1997. This court affirmed the trial court's denial of postconviction relief on appeal. State v. McGuire
(Apr. 20, 1998), Preble App. No. CA97-06-015, unreported.
Petitioner filed a second, successive postconviction petition in the trial court on July 20, 2000. In that petition, petitioner raised two grounds for relief: the constitutionality of the successive postconviction statute, R.C. 2953.23(A)(2); and the ineffective assistance allegedly rendered when counsel failed to adequately investigate and present mitigating evidence at the death penalty phase of the proceedings. After considering by written memorandum the evidence presented, the trial court again denied petitioner postconviction relief. Petitioner now appeals the trial court's denial of his successive postconviction petition in two assignments of error.
Assignment of Error No. 1:
 THE TRIAL COURT ERRED IN DISMISSING PETITIONER'S CLAIMS BECAUSE 2953.23(A)(2) [sic] IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED TO PETITIONER. [sic] IN VIOLATION OF THE SIXTH, EIGHTH
AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 9, 10 AND 19 OF THE OHIO CONSTITUTION.
 In this assignment of error, petitioner claims that R.C. 2953.23(A)(2)'s "clear and convincing evidence" standard, by which relief may be granted for constitutional error raised in successive postconviction petitions, violates provisions of the United States and Ohio Constitutions facially and as applied to him. The state responds that the statute is not unconstitutional, but imposes proper procedural bars while affording postconviction petitioners adequate process for relief.
An appellate court's standard of review when examining the constitutionality of a statute is de novo. Liposchak v. Bureau ofWorker's Compensation (2000), 138 Ohio App.3d 368, 385, citing OhioHistorical Soc. v. State Emp. Relations Bd. (1993), 66 Ohio St.3d 466,471. When constitutionality is challenged, legislative enactments are presumed constitutional. Liposchak, 138 Ohio App.3d at 385, citingAdamsky v. Buckeye Local School Dist. (1995), 73 Ohio St.3d 360, 361. Therefore, we independently review the constitutionality of R.C.2953.23(A)(2) while presuming it to be constitutional.
R.C. 2953.23 governs the requirements for filing successive petitions for postconviction relief. State v. Harrison (July 17, 2000), Warren App. No. CA99-07-077, unreported, at 5. Under this statute, the trial court is forbidden to entertain successive petitions filed after the one hundred eighty-day time limit established by R.C. 2953.21(A) unless certain conditions are met. Id. To gain relief, the petitioner must show either that he was unavoidably prevented from discovering the facts upon which he relies in the petition, or that the United States Supreme Court has, since the last petition, recognized a new federal or state right that applies retroactively to the petitioner. R.C. 2953.23(A)(1). Under R.C. 2953.23(A)(2), a petitioner must also show by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted or, if the claim challenges a sentence of death that, but for constitutional error at the sentencing hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence.
A. Facial Constitutionality
Petitioner first argues that the "clear and convincing evidence" standard of R.C. 2953.23(A)(2) facially violates the Supremacy Clause in Article VI of the United States Constitution because it imposes a more stringent burden of proof for relief when constitutional rights have been violated than that established by federal courts.[2] The Supremacy Clause of the Constitution of the United States provides:
 This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the contrary notwithstanding.
Clause 2, Article VI, United States Constitution.
It is well-established that pursuant to Clause 2, Article VI of the United States Constitution, the Supremacy Clause, the United States Congress has the power to preempt state law. Concepcion v. Concepcion
(1999), 131 Ohio App.3d 271, 280, citing In re Miamisburg TrainDerailment Litigation (1994), 68 Ohio St.3d 255, 259. However, preemption analysis begins with a rebuttable presumption against preemption. Concepcion, 131 Ohio App.3d at 280, citing Jenkins v. JamesB. Day Co. (1994), 69 Ohio St.3d 541, 544.
The Supremacy Clause nullifies state law to the extent that state law actually conflicts with federal law. See Bielat v. Bielat (2000),87 Ohio St.3d 350, 362, citing Florida Lime Avocado Growers, Inc. v.Paul (1963), 373 U.S. 132, 141, 83 S.Ct. 1210, 1217; Conkle v. Wolfe
(1998), 131 Ohio App.3d 375, 385. State law may be preempted by federal law when a federal statute includes language that explicitly provides for preemption of state law, when the wording or legislative history of the federal statute shows Congress' intent to exclusively regulate the area, or where the state law conflicts with a federal regulatory scheme.Concepcion, 131 Ohio App.3d at 280, citing Cleveland v. Berger (1993),91 Ohio App.3d 102, 109. Implied conflict preemption can occur in essentially two instances: (1) where it is impossible to comply with both state and federal requirements, or (2) where state law obstructs congressional objectives. Concepcion, 131 Ohio App.3d at 280, citingFreightliner Corp. v. Myrick (1995), 514 U.S. 280, 287, 115 S.Ct. 1483,1487.
Here, petitioner has failed to show that R.C. 2953.23(A)(2)'s "clear and convincing evidence" standard is in actual or implied conflict with federal law. Petitioner does not cite specific federal precedent that explicitly provides for preemption of state law, that shows Congress' intent to exclusively regulate the area, or that R.C. 2953.23(A)(2) conflicts with a federal regulatory scheme.[3] Petitioner does not cite specific federal law that sets a lower burden of proof for relief for such constitutional violations. Petitioner makes only general allegations that "federal courts have already determined what standard of evidence is necessary to give relief to convicted persons who have had their constitutional rights violated by the state." He has not shown that the "clear and convincing evidence" standard prevents him from complying with both state and federal requirements to obtain relief for a violation of constitutional rights.
Petitioner has also failed to show that R.C. 2953.23(A)(2)'s "clear and convincing evidence" standard obstructs congressional objectives. Indeed, as the state points out, postconviction state collateral review itself is not a constitutional right, even in capital cases, and the state has no obligation to provide postconviction relief. State v.Steffen (1994), 70 Ohio St.3d 399, 410, citing Pennsylvania v. Finley
(1987), 481 U.S. 551, 557, 107 S.Ct. 1990, 1994. By allowing successive postconviction petitions at all, R.C. 2953.23 gives petitioner more rights than those to which he is constitutionally entitled. We conclude that postconviction relief generally, and the mechanism for relief established in R.C. 2953.23 for a successive postconviction petition specifically, provides petitioner with an additional civil mechanism by which to challenge an alleged constitutional violation where none is required or prohibited by Congress.
Nonetheless, since the state has created a right to postconviction relief, it may not deprive the petitioner of that right. See Finley,481 U.S. at 557-558, 107 S.Ct. at 1994-1195. The federal constitution, however, does not dictate the exact form of postconviction relief. Seeid. In R.C. 2953.23(A), the state has provided petitioner an additional civil means to challenge his conviction in a successive petition, but has imposed a standard under which state courts may grant relief for an alleged constitutional violation when raised in such an action.
The state is free to impose proper procedural bars in order to restrict repeated returns to state court. Slack v. McDaniel (2000), 529 U.S. 473,489, 120 S.Ct. 1595, 1606. Time limits are proper procedural bars that the legislature may impose on postconviction relief. See State v. Bird
(2000), 138 Ohio App.3d 400, 407. R.C. 2953.23(A)(2)'s standard, which requires a showing of "clear and convincing evidence" for a constitutional violation to merit relief, does not apply until the petitioner has had a trial, an appeal, and has either waited too long to file a first postconviction petition or has already filed a first petition. Like time limits, the statute acts as a permissible procedural bar imposed to restrict a petitioner's return to state court with nothing more than bare claims. Therefore, petitioner has failed to show that R.C. 2953.23(A)(2)'s "clear and convincing evidence" standard violates the Supremacy Clause of the United States Constitution.
Petitioner next contends that R.C. 2953.23(A)(2)'s "clear and convincing evidence" standard is facially unconstitutional because it violates the Separation Clause encompassed in Section 32, Article II of the Ohio Constitution, usurping the judiciary's historical power to hear and to provide remedies for violations of constitutional rights. Under our constitutional scheme, the judicial power resides in the judicial branch. State ex rel. Bray v. Russell (2000), 89 Ohio St.3d 132, 136. The primary functions of the judiciary are to declare what the law is and to determine the rights of parties with respect to the law. Stanton v.Tax Comm. (1926), 114 Ohio St. 658, 672.
It is true that the determination of guilt in a criminal matter and the sentencing of a defendant convicted of a crime are solely the province of the judiciary. Russell, 89 Ohio St.3d at 136. In Russell, the Ohio Supreme Court analyzed Ohio's "bad time" statute, which gave the parole board, an arm of the executive branch of government, the authority to determine whether a prisoner had committed a crime and to punish the prisoner for commission of the crime. Id. at 135. Since the statute allowed the parole board to exercise a traditional judicial function, its power intruded well beyond the defined role of the executive branch of government and violated the separation of powers doctrine. Id. at 135-136.
Here, however, we are dealing not with a determination of guilt, but with a state-created civil proceeding. We must therefore determine whether the legislature has exercised a traditionally judicial function by imposing a standard by which courts may afford remedies in such state-created actions as successive petitions for postconviction relief. Postconviction petitions are special statutory proceedings. State v.Chinn (1998), 2000 WL 1458784, at *7, Montgomery App. No. C.A. 16764, unreported. The state has substantial discretion to develop and implement such proceedings in order to aid prisoners in seeking review.Finley, 481 U.S. at 559. Indeed, the primary function of the legislative branch of government is to write the laws by which we are governed.Huenergardt v. City of Canton (1983), 1983 WL 7358, *3, Stark App. No. CA-6066, unreported.
The legislature has the discretion to put into place special civil successive postconviction proceedings providing an additional means to challenge convictions. It logically follows that the legislature may also set the standard by which courts may review specific claims raised within those state-created proceedings. However, unlike the "bad time" statute at issue in Russell, the standard of review in R.C. 2953.23(A)(2) allows the judiciary to maintain its historical functions of hearing and determining the controversy between the parties; of ascertaining the facts; of applying the law to the facts; and of rendering a final judgment. See Fairview v. Giffee (1905), 73 Ohio St. 183, 190. R.C.2953.23(A)(2) therefore does not violate the doctrine of separation of powers.
Finally, petitioner argues that R.C. 2953.23(A)(2) is facially unconstitutional because it violates the "due course of law" and the "open courts" provisions encompassed in Section 16, Article I
of the Ohio Constitution. That section reads:
 All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law. Oh. Const. Art. I, section 16.
 The "due course of law" provision is the equivalent of the "due process of law" provision in the Fourteenth Amendment to the United States Constitution. Sorrell v. Thevenir (1994), 69 Ohio St.3d 415, 422.
Like a postconviction petition, a successive petition for postconviction relief is a statutory right, and not a constitutional right. See Steffen, 70 Ohio St.3d at 410. Accordingly, the successive postconviction statute is valid on due process grounds so long as it bears a real and substantial relation to the public health, safety, morals or general welfare of the public, and so long as it is not unreasonable or arbitrary. See State v. Murphy (Dec. 26, 2000), 2000 WL 1877526, at *7, Franklin App. No. 00AP-233, unreported, citing Mominee v. Scherbarth
(1986), 28 Ohio St.3d 270, 274.
Petitioner claims that the "clear and convincing evidence" standard bears no rational relationship to an alleged constitutional violation, that it renders postconviction relief futile by effectively requiring a petitioner to prove his innocence, and that it therefore treats successive postconviction petitioners as second-class litigants. As we have already found, however, R.C. 2953.23's standard is a permissible procedural bar imposed by the legislature to restrict a petitioner's repeated return to state court with nothing more than bare claims. It bears a substantial relationship to legitimate state concerns.
Moreover, the general assertion that the pursuit of a postconviction petition becomes a futile exercise is insufficient to overcome the presumptive constitutionality of the statute. See Murphy, 2000 WL 1877526 at *7, unreported. Indeed, Section 16, Article I does not absolutely guarantee that all claims filed will be litigated. State v. Gulertekin
(June 8, 2000), 2000 WL 739431, at *4, Franklin App. No. 99AP-900, unreported. The "open courts" and "due course of law" provisions only require that individuals have a reasonable period of time to seek redress of their claimed injuries. Id. at *4. R.C. 2953.23(A) allows a defendant a reasonable time to investigate his or her case, preserve all defenses and objections, and present all cognizable claims in court.Gulertekin, 2000 WL 739431, unreported, at *5.
Petitioner has had access to the courts in the form of a direct appeal, postconviction relief, and even successive postconviction relief. R.C. 2953.23(A)(2)'s imposition of a "clear and convincing evidence" standard for relief where a petitioner waits until a successive postconviction petition to raise a constitutional claim does not deprive him of due process simply because the state has imposed a reasonable procedural hurdle when it created that form of relief. The "clear and convincing evidence" standard is neither unreasonable nor arbitrary.
We therefore conclude that R.C. 2953.23(A)(2) complies with the supremacy clause, with the doctrine of separation of powers, and with the "open courts" and "due course of law" provisions of both the Ohio and the United States Constitutions. It is facially constitutional.
B. Applied Constitutionality
Petitioner also contends that R.C. 2953.23(A)(2) is unconstitutional as applied to him because the statute deprives him of the more lenient standard of review for a violation of his Sixth Amendment right to counsel. He claims that, under the "federal" standard, he would be entitled to have his petition entertained.
Petitioner's argument ignores that he has had ample opportunity to pursue, and has actually pursued, constitutional claims. Indeed, petitioner has had a trial, a direct appeal, and one postconviction petition, in which he raised the ineffectiveness of his counsel. Such procedure afforded petitioner ample time to investigate his case, to preserve all defenses and objections, and to present all cognizable claims to court. See Gulertekin, 2000 WL 739431, unreported, at *5. We fail to see how R.C. 2953.23(A)(2), as applied, precludes him from making any constitutional argument.
R.C. 2953.23(A)(2) is not unconstitutional. See State v. Sklenar
(1991), 71 Ohio App.3d 444, 449. Petitioner's first assignment of error is overruled.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED IN FINDING THAT PETITIONER'S CLAIMS ARE BARRED BY THE DOCTRINE OF RES JUDICATA, IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SEC. 9, 10 AND 19 OF THE OHIO CONSTITUTION.
 Petitioner next claims that the trial court incorrectly determined that the bar of res judicata
applies to his claim that he received ineffective assistance of counsel at the penalty phase of his capital trial because he supported the claim with competent evidence dehors the record. The state counters that the trial court correctly found that res judicata barred this claim because petitioner raised precisely the same error in his first postconviction petition.
Under the doctrine of res judicata, a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at trial or on an appeal from that judgment. State v. Perry (1967),10 Ohio St.2d 175, 180. Res judicata applies to postconviction proceedings, barring consideration of constitutional issues that have already been fully litigated before a prisoner's conviction or on direct appeal from that judgment. Id. at 179. Res judicata also applies to consecutive postconviction petitions, precluding a court from considering in a second petition the same issue that has been raised in the first petition. State v. Castro (1979), 67 Ohio App.2d 20, syllabus; State v.Blankenship (Nov. 10, 1997), Butler App. Nos. CA97-03-062, CA97-03-063, unreported, at 8.
Petitioner first argues that his claims cannot logically be barred byres judicata because his claims have not been fully litigated. Petitioner's claims could have been fully litigated, but petitioner failed to present adequate evidence to support those claims. Petitioner's second petition merely offers additional evidence with respect to issues previously addressed by the first petition.
In his first postconviction petition, petitioner alleged the ineffective assistance of his counsel during the death penalty phase of the proceedings. In Cause of Action X, petitioner claimed his attorneys had failed to adequately investigate and present mitigation evidence to the jury in the form of family member testimony, expert mitigation testimony, and psychiatric testimony. Ruling on his postconviction petition, the trial court determined that petitioner had failed to offer any documentary evidence to support his claims and that the record showed trial counsel had acted effectively in the mitigation phase of the proceedings.
In his second postconviction petition, petitioner made precisely the same argument but attempted to introduce additional evidence. Petitioner offered documents in the form of additional affidavits from family members regarding his formative years. The trial court found petitioner's claim of ineffective assistance barred because he had raised precisely the same claim in his first postconviction petition.
The operative facts in this case are very similar to those in Castro,67 Ohio App.2d 20, 22. There, the petitioner alleged ineffective assistance of counsel in a second postconviction petition. Id. The petitioner had alleged the ineffective assistance of counsel in his first postconviction petition. Id. The court found the second petition's claim barred by res judicata. Id. We reach the same result.
Petitioner's ineffective assistance claim was raised in his first postconviction petition. Petitioner failed to provide necessary affidavits to fully litigate the issue. Res judicata therefore bars his subsequent claim. Although petitioner attempts to differentiate his claims from the claims raised in Perry, 10 Ohio St.2d 175, he has offered no valid reason that res judicata should not apply to bar this claim, and it is not necessary to address the issue on its merits. Accordingly, the trial court's ruling is affirmed. Petitioner's second assignment of error is overruled.
Judgment affirmed.
WALSH and POWELL, JJ., concur.
[1] The trial court merged petitioner's kidnapping conviction with his rape conviction.
[2] In State v. Schlee (Dec. 17, 1999), 1999 WL 1313651, Lake App. No. 98-L-187, at *9, the petitioner made a very similar argument. The court did not, however, address that claim because petitioner had failed to preserve the alleged error in the trial court.
[3] One Ohio court has held that R.C. 2953.23(A)(2)'s provision for untimely filing of a postconviction petition is not in conflict with federal habeas corpus procedures. State v. Gibson (Jan. 19, 2001), 2001 WL 46245, *2, Portage App. No. 99-P-0114, unreported.